2017 WY 155

**Donald Dean FOLTZ, Jr., Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

S-17-0064

Supreme Court of Wyoming.

December 28, 2017

Representing Appellant: Office of the Public Defender: Diane Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; David E. Westling, Senior Assis-

tant Appellate Counsel. Argument by Mr. Westling.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Katherine A. Adams, Assistant Attorney General. Argument by Ms. Adams.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

KAUTZ, Justice.

[¶1] A jury convicted the appellant, Donald Dean Foltz, Jr., of first-degree murder and the district court sentenced Mr. Foltz to life without the possibility of parole. Mr. Foltz appeals his conviction, arguing the district court erred when it denied his motion for judgment of acquittal. We affirm.

## ISSUE

[¶2] Mr. Foltz raises one issue in this appeal:

> Did the trial court err by denying Mr. Foltz's motion for judgment of acquittal in that there was insufficient evidence to support proof of the elements of child abuse?

## FACTS

[¶3] In the fall of 2014, Mr. Foltz moved into the home of his girlfriend, Amanda Russell, and her two children. On December 22, 2014, Ms. Russell took her two-year-old son, BB, to a pediatrician, Dr. Fall, with concerns that BB had been vomiting, complaining of leg pain, and that he was bruising easily. After an examination and receiving the results of blood work, Dr. Fall concluded that BB's injuries were due to child abuse. He informed Ms. Russell of his suspicions and contacted the Department of Family Services (DFS). The next day, Sergeant Michael Hieb of the Campbell County Sheriff's Office accompanied an individual from DFS to follow up on Dr. Fall's report. Sergeant Hieb noted many bruises on BB; however, after Ms. Russell explained how BB received all the bruises, he concluded the injuries did not appear to be the result of child abuse.

[¶4] From the evening of December 23 through the morning of December 29, BB and his four-year-old sister, AR, spent most of their time with babysitters and family friends. During the evening of December 23, Ms. Russell left the children with their babysitter, Mercedes Corbett, while she and Mr. Foltz went to Rapid City to finish Christmas shopping. The children spent the day and night of December 24 with John and Candace LaValle. Ms. Russell arrived at the LaValle house at around noon on Christmas day, and after eating Christmas dinner and opening presents, took the children to her mother, Donna Blake's, home to open presents. Ms. Russell and AR went to Ms. Russell's home after spending time with the family at Ms. Blake's, while BB stayed the night with his grandmother. On December 26, both children went back to the LaValle home where they stayed until approximately noon on December 29. The LaValles then delivered the children to Ms. Russell at her residence.

[¶5] The children spent the rest of December 29 at the home with Ms. Russell and Mr. Foltz. The family had no visitors. That evening, Mr. Foltz put BB to bed and he and Ms. Russell went to bed at approximately 10:30 p.m. On December 30, Mr. Foltz got out of bed at 8:00 a.m. when he heard through the baby monitor that BB had awakened. Ms. Russell stayed in bed until after noon, but she could hear through a window Mr. Foltz, BB and AR working and playing outside. After Ms. Russell got out of bed, she remained in the home until about 4:00 p.m. when she left the children with Mr. Foltz for approximately forty-five minutes while she visited a friend. Ms. Russell returned home, but later that evening went to the grocery store to purchase electrolytes for BB because Mr. Foltz said that BB had vomited during the day. When Ms. Russell left for the store, Mr. Foltz had already put BB to bed for the night.

[¶6] While Ms. Russell was at the store, Mr. Foltz brought an unresponsive BB into Ms. Blake's home through the back door.[1] Mr. Foltz told Ms. Blake that he had checked on BB after hearing a noise on the baby

---

1. Ms. Blake's home is immediately next door to Ms. Russell's home in rural Campbell County.

monitor. He discovered there was something wrong with BB, he needed help, and he did not know what to do. Ms. Blake called 911, wrapped BB in a blanket, and then got into her vehicle with her boyfriend and BB to meet the ambulance on the way to the hospital. Mr. Foltz stayed behind to take care of AR.

[¶7] Ms. Blake attempted to perform CPR as instructed by the 911 operator, but when she pressed on BB's chest he began to vomit. She turned on a light in the vehicle and noticed a large bruise on BB's forehead. She then met the ambulance, and emergency medical personnel took BB to the hospital. Emergency staff made vigorous attempts to revive BB, but were unsuccessful. He was pronounced dead at 10:35 p.m. The emergency room physician who attempted to revive BB noted extensive bruising from BB's jaw to chest, a bruise with swelling on his forehead, a distended abdomen, and multiple bruises over the rest of BB's body. The physician believed the injuries were due to child abuse and contacted law enforcement.

[¶8] Dr. Donald Habbe performed an autopsy the next day and concluded that BB died from blunt force trauma to the abdomen. Dr. Habbe discovered multiple tears in BB's mesentery [2] which caused bleeding into the abdomen. He believed the tears were caused by multiple instances of force and were recent injuries that had occurred in the twenty-four hour period before BB's death.

[¶9] Following an investigation, the State charged Mr. Foltz with one count of first-degree murder under Wyo. Stat. Ann. § 6-2-101(a) (LexisNexis 2017).[3] The State alleged that Mr. Foltz caused BB's death during the perpetration of child abuse. A jury found Mr. Foltz guilty of the charge, and the district court sentenced Mr. Foltz to life imprisonment without the possibility of parole. Mr. Foltz filed a timely notice of appeal.

**STANDARD OF REVIEW**

[¶10] This Court reviews a motion for judgment of acquittal in the same light as the district court. *Bean v. State*, 2016 WY 48, ¶ 43, 373 P.3d 372, 387 (Wyo. 2016). When reviewing a motion for judgment of acquittal:

we examine and accept as true the evidence of the prosecution together with all logical and reasonable inferences to be drawn therefrom, leaving out entirely the evidence of the defendant in conflict therewith.

A motion for judgment of acquittal is to be granted only when the evidence is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime. Or, stated another way, if there is substantial evidence to sustain a conviction of the crime, the motion should not be granted. This standard applies whether the supporting evidence is direct or circumstantial.

*Bruce v. State*, 2015 WY 46, ¶ 52, 346 P.3d 909, 925-26 (Wyo. 2015) (quoting *Butcher v. State*, 2005 WY 146, ¶ 11, 123 P.3d 543, 548 (Wyo. 2005)). As a practical matter, the standard of review for denial of a motion for judgment of acquittal is the same as that used when an appeal claims insufficient evidence to convict. This is because these appeals both challenge the sufficiency of the evidence. Although Mr. Foltz facially challenges the denial of his motion for judgment of acquittal, he is in fact claiming that the evidence was insufficient to sustain a conviction. When applying this standard, we do not reweigh the evidence or re-examine the credibility of the witnesses. *Bean*, ¶ 45, 373 P.3d at 387. Instead, we simply determine "whether or not the evidence could reasonably support such a finding by the factfinder." *Id.* (quoting *Hill v. State*, 2016 WY 27, ¶ 13, 371 P.3d 553, 558 (Wyo. 2016)). "We review the sufficiency of the evidence 'from this perspective because we defer to the jury as the factfinder and assume they believed only the

---

**2.** Dr. Habbe described the mesentery as the tissues that hold the small and large bowels in place in the abdomen.

**3.** Section 6-2-101(a) states: "Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, sexual abuse of a minor, arson, robbery, burglary, escape, resisting arrest, kidnapping or abuse of a child under the age of sixteen (16) years, kills any human being is guilty of murder in the first degree."

evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt.'" *Id.* (quoting *Oldman v. State*, 2015 WY 121, ¶ 5, 359 P.3d 964, 966 (Wyo. 2015)). This standard applies whether the evidence supporting the conviction is direct or circumstantial. *Id.*, ¶ 44, 373 P.3d at 386 (quoting *Guerrero v. State*, 2012 WY 77, ¶ 14, 277 P.3d 735, 738-39 (Wyo. 2012)).

## DISCUSSION

[¶11] At the end of the State's case-in-chief, Mr. Foltz moved for a judgment of acquittal. Because the State alleged that Mr. Foltz killed BB during the perpetration of child abuse, the State was necessarily required to prove each element of child abuse found in Wyo. Stat. Ann. § 6-2-503(a) (LexisNexis 2017). That statute states:

(a) A person who is not responsible for a child's welfare as defined by W.S. 14-3-202(a)(i), is guilty of child abuse, a felony punishable by imprisonment for not more than ten (10) years, if:

(i) The actor is an adult or is at least six (6) years older than the victim; and

(ii) The actor intentionally or recklessly inflicts upon a child under the age of sixteen (16) years:

(A) Physical injury as defined in W.S. 14-3-202(a)(ii)(B);

(B) Mental injury as defined in W.S. 14-3-202(a)(ii)(A); or

(C) Torture or cruel confinement.

*Id.* Mr. Foltz argued that because the State had not presented evidence of how BB received his injuries, the State failed to prove that Mr. Foltz had intentionally or recklessly inflicted BB's injuries. After considering the "broad panoply of evidence," the district court denied the motion, concluding the State presented sufficient evidence that could allow a jury to conclude by proof beyond a reasonable doubt that Mr. Foltz committed the charged crime.

[¶12] Shortly after the trial concluded, Mr. Foltz filed a renewed motion for judgment of acquittal. He renewed his argument that the State had failed to prove he intentionally or recklessly caused BB's injuries, but also argued the State failed to prove that Mr. Foltz

was a person not responsible for the welfare of BB. Mr. Foltz additionally raised these arguments in a motion for new trial. While the record does not contain a written order denying the post-trial motions, the district court signed the judgment upon guilty verdict three days after Mr. Foltz filed the motions.

[¶13] On appeal, Mr. Foltz maintains the district court should have granted his motions for judgment of acquittal on the basis the State failed to prove Mr. Foltz intentionally or recklessly inflicted BB's injuries or that he was not responsible for the welfare of BB at the time he inflicted the injuries. We will discuss each of these elements in turn.

### *Intentionally or Recklessly Inflicts Injury*

[¶14] To sustain a conviction for murder premised upon child abuse under § 6-2-503(a), the State must prove Mr. Foltz intentionally or recklessly inflicted injury upon BB. Mr. Foltz argues the State failed to show he acted intentionally or recklessly because it did not provide evidence "that Mr. Foltz was angry or that he meant to hurt BB in any respect." Further, Mr. Foltz argues the State did not present any evidence of what conduct Mr. Foltz engaged in that created an unjustifiable risk sufficient to substantiate a finding of reckless infliction of injury upon BB.

[¶15] Before considering the evidence the State presented at trial, we must first address Mr. Foltz's misunderstanding of the "intent" required to prove child abuse. While Mr. Foltz does not openly argue the State was required to prove Mr. Foltz acted with the specific intent to cause BB's injuries, he implies as much by arguing the State did not present evidence that "Mr. Foltz was angry or that he meant to hurt BB in any respect." Additionally, he asserts that our precedent "indicates that abuse must be deliberate." These statements are wholly inaccurate. Our precedent is clear that child abuse is a general intent crime; therefore, the State need not show that Mr. Foltz intended the consequence of his actions. *Rowe v. State*, 974 P.2d 937, 939-40 (Wyo. 1999). Instead, it must prove that Mr. Foltz intentionally or recklessly **acted** in a way that resulted in BB's

physical injury. *Id.* at 940. Thus, evidence regarding Mr. Foltz's feelings toward BB or whether he "meant to hurt BB" are not required in the final inquiry.

[¶16] The jury determined that Mr. Foltz had both intentionally and recklessly caused BB's physical injuries. Applying our standard of review to the evidence presented at trial, we are convinced the State presented sufficient evidence to sustain Mr. Foltz's conviction and, thus, the district court properly denied his motion for judgment of acquittal. Dr. Donald Habbe, the pathologist who performed BB's autopsy, testified that BB died from blunt force trauma to the abdomen, which caused tears in the mesentery and bleeding into the abdomen. Dr. Habbe stated he discovered three mesentery tears, and concluded that the tears had to be caused by multiple instances of abdominal trauma. Dr. Habbe believed the mesentery injuries were recent, having been caused within a twenty-four hour period prior to BB's death on December 30. He also noted that BB had suffered contusions and abrasions over widespread areas of his body, including his forehead, cheek, nose, neck, chin, ears, back, abdomen, and buttocks.

[¶17] Dr. Thomas Bennett, a forensic pathologist, reviewed BB's autopsy at the request of the Campbell County Coroner. Dr. Bennett testified that BB died of "traumatic injuries to his abdomen from non-accidental blunt force trauma to his abdomen." Dr. Bennett explained that the mesenteries are soft, flexible, resilient, and are rarely injured absent non-accidental force. He also testified that tears are the result of tremendous force, such as forceful punches and kicks or car crashes, and not from falling or running into the corner of a table or down the stairs or other routine toddler activities. Dr. Bennett agreed that, due to the location of the mesentery tears, three separate events caused the tears, and that the injuries occurred in roughly the twenty-four hours before BB's death.

[¶18] Amanda Russell testified that Mr. Foltz lived with her and her children in her home. Ms. Russell stated that Mr. and Mrs. LaValle brought BB and AR home sometime before noon on December 29, and she did not notice any visible injuries to BB at that time. She also testified that the children stayed home with her and Mr. Foltz for the reminder of the day and they did not have any visitors. On December 30, Mr. Foltz got up at approximately 8:00 a.m. when BB woke up; however, Ms. Russell did not get out of bed until after noon that day. Ms. Russell was at the home until approximately 4:00 p.m. when she left for thirty to forty-five minutes to visit a friend. She left BB at home with Mr. Foltz. After her visit, Ms. Russell returned to the home, but left later that evening to go to the grocery store. Again, BB stayed at the home with Mr. Foltz, although Mr. Foltz had put BB to bed before Ms. Russell left. Additionally, Investigator Pownall testified that Mr. Foltz told him that only he, Ms. Russell, and the children were at the home on December 30.

[¶19] Based upon this evidence, a reasonable jury could, and did, conclude that Mr. Foltz—one of only two adults who were with BB during the time-period wherein the injuries were inflicted—intentionally and recklessly inflicted the non-accidental blunt force trauma to BB's abdomen. Despite this evidence, Mr. Foltz seems to argue the evidence is insufficient because it does not shed light on how Mr. Foltz caused BB's injuries. However, the State is not required to prove how Mr. Foltz inflicted the injuries; instead, it is required to prove simply that he intentionally and recklessly caused the injuries. *See* § 6-2-503(a).

[¶20] This Court has acknowledged that child abuse is a private act, often being witnessed only by the victim and the perpetrator. *Marshall v. State*, 646 P.2d 795, 797 (Wyo. 1982). In order "to protect the most helpless members of our society from violence on the part of others," we have recognized that "opportunity, together with injuries consistent with child abuse, is sufficient evidence to support a conviction for homicide." *Goldade v. State*, 674 P.2d 721, 727 (Wyo. 1983) (citing *Marshall*; *Rinehart v. State*, 641 P.2d 192 (Wyo. 1982); *Grabill v. State*, 621 P.2d 802 (Wyo. 1980); *Seyle v. State*, 584 P.2d 1081 (Wyo. 1978); *Jones v. State*, 580 P.2d 1150 (Wyo. 1978)). In *Jones*, the State presented the following evidence:

Appellant's stepdaughter died as a result of an acute bilateral subdural hemorrhage; such a hemorrhage is almost always caused by physical trauma of considerable force; the child had three bruises on her head which could have been caused by a hand or other blunt instrument; these bruises and other injuries were not present prior to the time that the child came under the exclusive control of appellant; appellant's wife left appellant alone with her apparently-normal child for a period of twenty to twenty-five minutes; and the hemorrhage, in the attending doctor's opinion, could not have been caused by a prior high-chair-fall or other accident.

*Jones*, 580 P.2d at 1152. The Court concluded this evidence was sufficient for a jury to reasonably infer that the appellant inflicted the injury that caused the victim's death. *Id.*

[¶21] Similarly, in *Grabill*, the victim's mother left her seemingly normal sleeping infant alone with the appellant. *Grabill*, 621 P.2d at 804. When the mother returned less than two hours later, the infant was still sleeping and the appellant showed the mother a bruise on the infant's ear. *Id.* The mother took the infant to the hospital, and the treating doctor testified that the child was comatose and, due to bruising on the child's head, he believed she had suffered a severe brain injury from non-accidental trauma. *Id.* at 805. The doctor also testified that a fall from a changing table or out of bed would not be severe enough to cause the injury. *Id.* Another doctor who treated the infant reiterated that the injuries were caused by non-accidental trauma, such as shaking the baby, and that a fall would likely not cause the injuries. *Id.* at 806. The Court concluded this evidence was sufficient for a jury to reasonably infer that the appellant caused the infant's injuries when the mother left her alone with the appellant. *Id.* While the appellant had denied causing the injuries, the Court recognized the jury "chose to accept the circumstantial evidence against appellant rather than his denial." *Id.*

[¶22] Just as in *Jones* and *Grabill*, the State produced medical testimony concluding that BB's injuries were the result of non-accidental blunt force trauma to the abdomen requiring at a minimum reckless, if not intentional, conduct. Additionally, the evidence is undisputed that Mr. Foltz had the opportunity to cause the injuries because he was with BB the entire twenty-four hours preceding BB's death, and the only adult present other than Ms. Russell. While Ms. Russell was also at home with BB, the jury must have believed her when she testified that she did not abuse BB.

[¶23] The State presented additional incriminating evidence not present in *Jones* and *Grabill*. The jury heard testimony about inconsistent statements Mr. Foltz made in the days following BB's death. At times, Mr. Foltz said he found BB unconscious after he heard unidentified sounds on the baby monitor, while at other times he said he just spontaneously checked on BB. Mr. Foltz told Investigator Pownall that he immediately ran to Ms. Blake's house with BB after finding the child unresponsive; however, he told others that he put BB in the bathtub to try to revive him before taking him to Ms. Blake's home. Mr. Foltz also gave inconsistent stories about the large abrasion and bruise on BB's forehead. He told Investigator Pownall that BB had run into the knob on his bedroom door at about noon on December 30. But, Mr. Foltz told one of his co-workers that he may have hit BB's head on the doorjamb as he was taking the child to Ms. Blake's home.

[¶24] In addition to the inconsistent statements, the jury heard comments made by Mr. Foltz which it could have found incriminating. Mr. Foltz told his supervisor at work that, "Even if I did hit [BB's] head on a doorjamb, [ ] they would have to prove it." He also told the same co-worker that BB's older sister "would not be a good witness to anything because she talks to dead people. Her father had passed and she's somehow communicating with her father[.]" Mr. Foltz told a co-worker that BB died from an infection in his throat, although at that point in time Mr. Foltz knew the cause of BB's death was non-accidental blunt force trauma. This co-worker also testified that Mr. Foltz said, "Even if I did kill the kid, [BB] was the only witness and he's dead now."

[¶25] Finally, the jury heard the testimony of several witnesses who stated they observed other injuries on BB in the days before his death. Dr. Fall testified that he treated BB on December 22, 2014, and noted multiple bruises on his body, including in the genital area. Dr. Fall ordered blood tests, and when the results came back normal, Dr. Fall told Ms. Russell that he suspected BB's bruising was the result of child abuse. He also reported the visit and his suspicions to DFS. The doctor who treated BB in the emergency room also noted bruising consistent with abuse, particularly bruising in his perineal region. This bruising was also noted on December 23, 2014, by Sergeant Hieb when he followed up on Dr. Fall's child abuse report, and by Ms. LaValle in the days immediately preceding BB's death. From this evidence, the jury could reasonably infer that Mr. Foltz's abuse of BB was not simply an isolated act, but repeated intentional actions that ultimately led to BB's death.

[¶26] The jury considered and weighed the credibility of the witness testimony, heard the statements Mr. Foltz made, and concluded that Mr. Foltz caused BB's death. "[W]e do not have the benefit of how the trial judge (jury) sees and hears the witness-the pitch of the voice, facial changes, the movement in the witness-all of which may tell a separate story, to be given credence. The conclusion of what preponderates is with the trier of fact." *Marshall*, 646 P.2d at 797. Our standard of review requires we defer to those conclusions if the evidence allows, and "[a]ppellate courts cannot try a case de novo." *Id.* The evidence presented by the State supports a conclusion that BB died from non-accidental trauma, and that Mr. Foltz acted intentionally, and necessarily recklessly, when he inflicted the trauma. Granted, the evidence linking Mr. Foltz to the abuse is circumstantial; however, "[t]his type of case is usually presented of necessity by circumstantial evidence." *Marshall*, 646 P.2d at 797. The district court did not err in denying Mr. Foltz's motion for judgment of acquittal.

### Person Responsible for the Welfare of a Child

[¶27] Mr. Foltz argues the State failed to prove that he was "a person not responsible for the welfare of the child" as required by § 6-2-503(a) because the evidence showed that Ms. Russell left her children alone with him on two occasions the day BB died. "A person responsible for a child's welfare" is defined as "the child's parent, noncustodial parent, guardian, custodian, stepparent, foster parent or other person, institution or agency having the physical custody or control of the child." Wyo. Stat. Ann. § 14-3-202(a)(i) (LexisNexis 2017). He argues that because BB at times was with him and not with Ms. Russell, he was a person responsible for BB's welfare and his conviction cannot stand.

[¶28] Mr. Foltz's argument completely disregards our standard of review in sufficiency of the evidence claims. As stated above, when reviewing the sufficiency of the evidence to support a district court's denial of a motion for judgment of acquittal, we do so "with the assumption that the evidence of the prevailing party is true, disregard the evidence favoring the unsuccessful party, and give the prevailing party the benefit of every favorable inference that we may reasonably draw from the evidence." *Levengood v. State*, 2014 WY 138, ¶ 11, 336 P.3d 1201, 1203 (Wyo. 2014) (quoting *Brown v. State*, 2014 WY 104, ¶ 8, 332 P.3d 1168, 1171-72 (Wyo. 2014)). Thus, we must review the evidence and determine if evidence exists that would allow a jury to conclude that Mr. Foltz was a person not responsible for the welfare of BB when the injuries occurred. In doing so, we must disregard any evidence that would support a conclusion to the contrary.

[¶29] The question of whether an individual is a person responsible for the welfare of a child does not always have a clear and obvious answer. In many situations, the answer is factually driven and the jury must determine whether an individual fits the criteria based upon the facts presented by the State. This is one of those situations. There is no dispute that Mr. Foltz was not BB's parent, noncustodial parent, guardian, stepparent, or foster parent. However, if the facts presented would allow, Mr. Foltz could arguably be a "custodian" or "other person . . . having the physical custody or control" of

BB. Section 14-3-202(a)(i). While Wyoming law does not further define the catchall "other person" category, a "custodian" is defined as: "a person, institution or agency responsible for the child's welfare and having legal custody of a child by court order or having actual physical custody and control of a child and acting in loco parentis[.]" Wyo. Stat. Ann. § 14-3-402 (LexisNexis 2017).

[¶30] Ms. Russell's testimony supports the jury's conclusion that when the fatal child abuse occurred, Mr. Foltz was not a "custodian" or "other person . . . having physical custody or control" of BB. Ms. Russell testified that, although Mr. Foltz lived in her home with her children, she never gave him the authority to discipline the children. She also testified that she never asked him to babysit the children. She explained that she did not do so because she already had childcare arrangements established and she did not want to change the children's routine. She also stated that she did not want to impose upon Mr. Foltz because their relationship was still new at that point in time. This testimony is sufficient for a reasonable jury to believe that Mr. Foltz was not an "other person . . . having physical custody or control" of BB when the fatal abuse occurred.

[¶31] As Mr. Foltz has pointed out, it is undisputed that Ms. Russell left the children at home with him twice for brief periods of time during the twenty-four hour period before BB died. Because of that undisputed fact, he claims that our opinion in *Rogers v. State*, 2015 WY 48, 346 P.3d 934 (Wyo. 2015), dictates that he must be considered a person responsible for the welfare of a child. In *Rogers*, this Court considered whether a babysitter could hold a position of authority over his charge for purposes of Wyoming's sexual assault statutes. *Id.*, ¶¶ 11-17, 346 P.3d at 937-39. We specifically discussed the definition of "custodian" found in § 14-3-402(a)(vii) and concluded "this definition would clearly imply that an individual serving as a babysitter is a custodian of a minor and thus in a position of authority." *Id.*, ¶ 16, 346

P.3d at 938. We also discussed the fact that Mr. Rogers was left in charge of the children while their father left and that he was the only adult present in the residence. *Id.*, ¶ 17, 346 P.3d at 939. However, it is important to recognize that we were analyzing this issue using our sufficiency of the evidence standard of review. *Id.* We concluded that based on the evidence before the *Rogers* jury, the State presented sufficient evidence for the jury to conclude Mr. Rogers, as a babysitter, was acting *in loco parentis*[4] and thus was a custodian. *Id.* This conclusion is not dispositive as to whether the State presented sufficient evidence in this case to support the jury's conclusion that Mr. Foltz was not responsible for the welfare of BB. The two cases rely on different statutes, and while there may be similarities between the application of the two, each case presented unique facts for the jury to consider. There was adequate evidence before the jury indicating that Ms. Russell had not placed Mr. Foltz in the role of a parent (not acting *in loco parentis*), for it to find that he was not a "custodian" and not responsible for BB's welfare.

[¶32] Additionally, even if the jury had concluded Mr. Foltz was responsible for the welfare of BB during those two short periods of time, the State's evidence would still allow the jury to find that Mr. Foltz inflicted the injuries at a time when Ms. Russell was home and Mr. Foltz was not responsible for BB's welfare. The jury could reasonably have concluded that the injuries occurred before Ms. Russell left late in the afternoon because Mr. Foltz told her BB had been throwing up during the afternoon—indicating that at least some of the injuries had already occurred by then. Similarly, the jury could reasonably have found that because BB was asleep when Ms. Russell left him with Mr. Foltz later that night, the injuries occurred sometime earlier, while Ms. Russell was home and had "physical custody." Because the State presented evidence that established Mr. Foltz was not responsible for BB's welfare during a substantial majority of the twenty-four hours before BB's death, including the reasonably

---

4. *In loco parentis* is a Latin phrase meaning "in the place of a parent" or "[a]cting as a temporary guardian of a child." *Daniels v. Carpenter*, 2003 WY 11, ¶ 12, 62 P.3d 555, 560 (Wyo. 2003) (quoting Black's Law Dictionary 791 (7th ed. 1999)).

likely times when the fatal injuries occurred, the district court did not err when it denied Mr. Foltz's motion for judgment of acquittal.

[¶33] While the basis of our opinion rests on our decision that the State presented sufficient evidence to support a conclusion that Mr. Foltz was not responsible for the welfare of the child, we take this opportunity to point out the curious nature of the child abuse statute and Mr. Foltz's situation. Wyoming's child abuse statute is framed in such a way that any person can commit child abuse, whether they are a person responsible for the welfare of a child or not. *See* § 6-2-503. However, the elements the State must prove differ depending upon within which category an individual falls. As explained *supra* ¶ 11, if the defendant is not responsible for the welfare of the child, the State must prove the individual is an adult or at least six years older than the victim and the victim must be under sixteen years old. Section 6-2-503(a). In contrast, if the defendant is responsible for the welfare of the child, there is no age requirement for the defendant, the victim must be under eighteen years old, and the State must show the injuries were not the result of reasonable corporal punishment. Section 6-2-503(b). Thus, the legislature's intent in creating the two categories was not to narrow the class of people that can be held criminally responsible for child abuse, but instead takes into consideration the different dynamics between adults who have a legal responsibility for a child, including the authority to discipline using corporal punishment, and those who do not.

[¶34] In this case, the question of whether Mr. Foltz was or was not responsible for the welfare of BB is a distinction without a difference. Mr. Foltz was thirty-four years old when BB died, satisfying the age requirement of the defendant under either subsection of the statute. Further, BB was two years old, satisfying the age requirement of the victim under either subsection. Interestingly, even though the State charged Mr. Foltz with not being responsible for BB's welfare, the district court nonetheless instructed the jury that the State had to prove BB's injuries were not the result of reasonable corporal punishment:

Instruction No. 16

The elements of the crime of Child Abuse, identified as the underlying crime in the charge of Murder in the First Degree (elements of which are found in Instruction No. 15), are:

1. On or between December 29, 2014 and December 30, 2014;
2. In Campbell County, Wyoming;
3. The Defendant, Donald D. Foltz, Jr.;
4. A person not responsible for the welfare of the alleged victim, [BB];
5. Who was at least six (6) years older than the alleged victim, [BB];
6. Intentionally or recklessly;
7. Inflicted physical injury;
8. Which was not the result of reasonable corporal punishment;
9. Upon [BB], who was the time under the age of sixteen (16) years.

If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should proceed to determine your verdict on the charged crime of Murder in the First Degree.

Further, the verdict form required the jury to consider whether the injuries were the result of reasonable corporate punishment. Thus, regardless of whether Mr. Foltz was responsible for BB's welfare or not, the State proved the required elements of both subsections of the crime.

## CONCLUSION

[¶35] The State presented expert medical testimony that BB died from three separate mesentery tears that were caused by non-accidental blunt force trauma and inflicted within twenty-four hours of his death. The evidence also established that BB had likely been abused over a period of time before his death. The State showed that Mr. Foltz was with BB that entire twenty-four period and, therefore, was one of only two persons who could have inflicted the fatal injuries. The other person, Ms. Russell, testified that she did not injure BB. This evidence, coupled with incriminating and inconsistent state-

ments made by Mr. Foltz, could lead a reasonable jury to conclude that Mr. Foltz intentionally and recklessly inflicted physical injury on BB. Further, viewing the evidence in the light most favorable to the State, the State presented sufficient evidence for the jury to conclude that Mr. Foltz was not responsible for the welfare of BB when he inflicted the injuries. Therefore, the district court appropriately denied Mr. Foltz's motion for judgment of acquittal.

[¶36] Affirmed.