# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 138

**OCTOBER TERM, A.D. 2014**

November 4, 2014

KENNETH RAY LEVENGOOD,

Appellant
(Defendant),

v.

S-14-0078

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellant:*
    Donald A. Cole, Cole & Cole, Cheyenne, Wyoming.

*Representing Appellee:*
    Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jenny L. Craig, Senior Assistant Attorney General; Caitlin F. Young, Assistant Attorney General.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

**NOTICE:** **This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]   Kenneth Levengood was convicted of aggravated assault and battery under Wyo. Stat. Ann. § 6-2-502(a)(iii) for threatening to use a drawn deadly weapon on his ex-girlfriend.  On appeal, Mr. Levengood contends there was insufficient evidence that he threatened to use the weapon.  We affirm.

## *ISSUE*

[¶2]   Was the evidence presented at trial sufficient to prove Mr. Levengood threatened to use the knife he was carrying?

## *FACTS*

[¶3]   On the morning of January 9, 2013, as twelve-year-old A.L. got ready for school, her father, Mr. Levengood, opened her bedroom door with an eighteen-inch kitchen knife in his hand and told her to go back to sleep.  Realizing he was drunk and "acting strange," A.L. followed her father into the hallway and told him to go to the kitchen and stay there. Mr. Levengood did not respond, but clenched his jaw, and with knife still in hand walked to the kitchen.

[¶4]   A.L. "had never seen him act like that before," and, scared that he would hurt her, his ex-girlfriend, or himself, she entered the bedroom Mr. Levengood shared with his ex-girlfriend, Aundrea Thompson,[1] to tell her what was going on.  Ms. Thompson told A.L. to lock the bedroom door and then she tried calling two members of Mr. Levengood's family.  Mr. Levengood rattled the doorknob while asking to be let in, to which Ms. Thompson responded, "No."  Mr. Levengood forced the bedroom door open and entered, holding the knife down at his side.  Ms. Thompson told him to leave, and he complied. A.L. locked the bedroom door once again.

[¶5]   Unable to reach Mr. Levengood's relatives, Ms. Thompson called 911.  A.L. testified that while Ms. Thompson was talking to the 911 dispatcher, "[D]ad came again to the door, and it sounded like he was kind of like knocking, kind of like pounding on it."

[¶6]   Officer Michael Sutton, a crime scene technician with the Cheyenne Police Department who arrived shortly thereafter, estimated the bedroom door contained eight to eleven independent marks "consistent with knife marks that I've seen on other cases." Towards the top of the door, and down to the center, "was a very long and sort of

---

[1]  Testimony at trial indicated that Ms. Thompson and Mr. Levengood had recently ended their relationship.  Ms. Thompson would remain in the house until the end of the month, at which time she was going to move to Laramie, Wyoming, to begin school.

1

pyramid-shaped . . . or triangular-shaped slash mark which appeared to be done with some sharp object." At several other locations, Officer Sutton reported "smaller holes that looked like something was poked into the door, very skinny, which I would attribute to what I've seen with knife wounds[.]" In one location there was an entry hole followed by a four-to-five inch slash that appeared to have been created by a knife pushed into the door and then forced down through the door using "significant force." Officer Sutton also observed an "unusual" large dent and pry marks on the top of the doorknob, as well as "jab" marks in the door jamb, appearing as though "something had been stuck into the door, and then it appeared as someone pried down on the doorknob, like someone was trying to damage the doorknob." At trial, commenting on the marks, Officer Sutton testified:

> You know, typically when I see marks like this in a door, this is from a very violent situation. It's not the first time I've seen marks like this. I've seen marks like this in walls. I've seen marks like this in doors. I've seen marks like this in people. And every time I've seen marks like this it was a very violent situation.

[¶7] A.L. further testified:

> And then he was able to get the door open again. And I think he could tell that Andrea [sic] was on the phone with the police, and so he put the knife -- he walked over into the room and he put the knife on the stand, on the TV stand, and he walked out.

[¶8] The police arrived soon after, and as Ms. Thompson and A.L. left the bedroom, A.L. noticed marks on the bedroom door and walls of the hallway outside the bedroom.

[¶9] When Officer Sutton went down the hallway leading to the bedroom, he observed fresh slash marks on the hallway walls. Regarding these marks, Officer Sutton testified, "You know, in my training and experience, when you see slash marks like this . . . these are typically of a violent situation. It indicates to me that someone's very upset, and has made these marks in anger."

[¶10] Mr. Levengood was arrested and charged with one count of aggravated assault and battery for threatening to use a drawn deadly weapon against Ms. Thompson. Wyo. Stat. Ann. § 6-2-502(a)(iii) (LexisNexis 2013). Following a bench trial, the district court found Mr. Levengood guilty. He was sentenced to serve four to five years in prison, suspended in favor of three years supervised probation. Mr. Levengood timely filed this appeal.

2

[¶11] Mr. Levengood contends the State presented insufficient evidence to establish beyond a reasonable doubt that he threatened to use a drawn deadly weapon. Our standard for reviewing the sufficiency of evidence is well established.

> [W]e review that evidence with the assumption that the evidence of the prevailing party is true, disregard the evidence favoring the unsuccessful party, and give the prevailing party the benefit of every favorable inference that we may reasonably draw from the evidence. We will not reweigh the evidence nor will we re-examine the credibility of the witnesses.

*Brown v. State*, 2014 WY 104, ¶ 8, 332 P.3d 1168, 1171-72 (Wyo. 2014) (quoting *Perritt v. State*, 2005 WY 121, ¶ 9, 120 P.3d 181, 186 (Wyo. 2005)).

[¶12] "[W]e must determine whether a rational trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *Hart v. State*, 2003 WY 12, ¶ 8, 62 P.3d 566, 569 (Wyo. 2003) (quoting *Williams v. State*, 986 P.2d 855, 857 (Wyo. 1999)). In other words, we do not consider "whether or not the evidence was sufficient to establish guilt beyond a reasonable doubt, but [instead] whether or not the evidence could reasonably support such a finding by the factfinder." *Broom v. State*, 695 P.2d 640, 642 (Wyo. 1985). We review the decision from a criminal bench trial the same as we would that of a jury trial. *Romero v. State*, 2010 WY 84, ¶ 6, 233 P.3d 951, 953 (Wyo. 2010) (citing *Fitzgerald v. State*, 599 P.2d 572, 574 (Wyo. 1979) ("The function of the finder of fact in [criminal] cases tried to a court is identical to that in cases tried to juries, and the same rules are applicable with respect to the standards and principles applied in appellate review.")).

*DISCUSSION*

[¶13] Mr. Levengood was convicted of aggravated assault and battery under Wyo. Stat. Ann. § 6-2-502(a)(iii), which reads,

> (a) A person is guilty of aggravated assault and battery if he:
>
> . . . .
>
> (iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another[.]

[¶14] Section 6-2-502(a)(iii) is a general rather than a specific intent crime. *Cox v. State*, 829 P.2d 1183, 1185 (Wyo. 1992); *Simmons v. State*, 674 P.2d 1294, 1297 (Wyo. 1984); *Carfield v. State*, 649 P.2d 865, 869 (Wyo. 1982). In *Dean v. State*, 668 P.2d 639 (Wyo. 1983), we explained the difference.

> When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence the fact that the defendant intended to do the proscribed act makes that crime a general criminal intent offense. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.

*Id*. at 642 (citations, quotation marks, and emphasis omitted).

[¶15] As a general intent crime, the language, "[t]hreatens to use," describes what a defendant must do with a drawn deadly weapon to be guilty of aggravated assault under § 6-2-502(a)(iii). *Dean*, 668 P.2d at 642. We have held that "'threatens to use' requires proof of an actual threat of physical injury during the act of employing a deadly weapon." *Johnston v. State*, 747 P.2d 1132, 1134 (Wyo. 1987) (internal citation omitted). In *Johnston*, we approved the trial court's definition of "threat:"

> A threat is an expression of an intention to inflict pain, injury, or punishment. It may be expressed by words or acts, or a combination of words or acts. Considering all the circumstances of the case, you must decide whether the defendant's words and acts amounted to an express or implied statement of his intention to use a drawn deadly weapon to inflict pain, injury, or punishment.

*Id*. at 1135.

[¶16] In *Johnston*, appellant Johnston, observed an altercation between two relatives. *Id*. at 1133. Johnston retrieved a knife that was dislodged during the altercation and approached one of the two relatives, brandishing the knife in the area of the person's face and neck. *Id*. The victim testified that Johnston nicked him with the knife. *Id*. Johnston claimed that the only threat he made towards the victim was possessing the knife while questioning: "You like to play with knives?" *Id*. He was convicted of aggravated assault under § 6-2-502(a)(iii). *Id*.

[¶17] In Johnston's appeal, we looked to the circumstances of the altercation in order to determine whether the jury could properly infer a threatening employment of the knife as

an expression of intention to inflict pain or injury. *Id*. at 1135. Giving every favorable inference to the State's evidence, we concluded:

> Appellant was a forty-three-year old, 6' 3" man, weighing 245 pounds, towering over McDaneld, a nineteen-year-old, 5' 11" boy, weighing 155 pounds; "working," i.e., opening and closing, the butterfly knife as he approached within inches of the boy's throat; nicking the boy; only to be interrupted in the further employment of the knife by the advent of McDaneld's mother onto the scene.
>
> Under these circumstances, not only could the jury properly have inferred a threatening employment of the drawn knife as an expression of an intention to inflict pain and injury, but also as an accomplishment of that expression as manifested by the nicked and bloodied throat. These were reasonable inferences that the jury was entitled to draw from the evidence before it.

*Id*. at 1137.

[¶18] In *Cox v. State*, 829 P.2d 1183, 1186 (Wyo. 1992), the highly-intoxicated defendant approached a police officer while slashing back and forth with a hunting knife. We explained that "actual threat," requires that the alleged threat be measured by the "defendant's conduct and not by the victim's reaction." We also stated that "[a]s a general intent crime, aggravated assault requires only that intent which may be inferred from doing the act which constitutes the offense charged; i.e., slashing back and forth with the hunting knife." *Id*. (citing *Carfield*, 649 P.2d at 869; *Sanchez v. State*, 567 P.2d 270, 279 (Wyo. 1977)).

[¶19] We are not concerned with the subjective reaction of the victim. Instead, we must objectively consider the actions of the defendant, and decide whether a rational trier of fact could infer from Mr. Levengood's words and acts an intention to use a drawn deadly weapon to inflict pain, injury, or punishment. Here, there is undisputed evidence from Mr. Levengood's daughter that he was drunk and "acting strange." She also reported that a 240-pound Mr. Levengood twice violently forced his way through a locked door with a knife. The evidence includes a number of photographic exhibits detailing the significant damage Mr. Levengood inflicted upon the hallway and bedroom door while trying to gain entry to the bedroom. Finally, we have the testimony of Officer Sutton who concluded, "every time I've seen marks like this it was a very violent situation." Construing this undisputed evidence and the reasonable inferences drawn therefrom in the light most favorable to the State, we conclude that a rational trier of fact could find that, under the circumstances, Mr. Levengood's conduct constituted a threat to Ms. Thompson under § 6-2-502(a)(iii).

[¶20]  Mr. Levengood argues that "it was not illegal for the Appellant to remain in his home, enter the bedroom or to have a knife in his possession."  We agree that the mere possession of a deadly weapon does not constitute a threat under § 6-2-502(a)(iii).  *See Hart*, 2003 WY 12, ¶ 8, 62 P.3d at 569; *Johnston*, 747 P.3d at 1134.  However, this harmless picture ignores the totality of the circumstances, which included a highly-intoxicated 240-pound ex-boyfriend; in possession of an 18-inch knife; violently seeking entry to a locked bedroom where A.L. and Ms. Thompson sought refuge; and slashing, puncturing, and prying with the knife to gain entry.

[¶21]  Mr. Levengood insists that because he never used the knife directly on Ms. Thompson, instead attacking the door, he never "threatened to use" the knife.  He argues "[t]here is no evidence that the Appellant ever raised the knife in a threatening manner.  There are no motions involving slashing, waving, pointing, stabbing, jabbing or throwing."  In fact, the evidence shows that Mr. Levengood did use the knife in a threatening manner; the only question is whether he can be insulated by the presence of a locked door between him and his victim, a door which he twice broke open.

[¶22]  In *Hart v. State*, 62 P.3d 566 (Wyo. 2003), Hart attempted to gain entry to his ex-wife's parent's residence.  As Hart walked toward the home, Ms. Moline's father went to the front door to lock and secure it.  *Id.* at 569.  Hart opened the outer screen door and demanded, "you better let me in."  *Id*.  Mr. Moline responded by telling Hart to go home and cool off or settle down.  *Id*.  Hart then pulled the gun out of his back waistband, and showed it to Mr. Moline by holding it straight up in the air, pointed towards the sky.  *Id*.  Hart then started to beat on the door. *Id*.  When it was apparent that he would not gain entry, Hart left, pausing in front of Ms. Moline's car and discharging four rounds into her vehicle.  *Id*.  Hart was charged and convicted under § 6-2-502(a)(iii).

[¶23]  On Hart's appeal for sufficiency of the evidence we affirmed, stating:

> Viewed in a light most favorable to the State, the facts show that Hart went to the front door of the Molines' home and told Mr. Moline, "you better let me in."  To reinforce this demand, Hart held up his handgun for Mr. Moline to see. Clearly, this is more than mere presence of a weapon in Hart's hand. Instead, given Hart's demands, and his display of a deadly weapon to the man resisting the demands, we are satisfied that a jury could rationally conclude that Hart made an actual threat to use a drawn deadly weapon on Mr. Moline. We thus conclude there was sufficient evidence to support the conviction.

*Id*. at 569-570.

[¶24]  As in *Hart*, even though Mr. Levengood did not point the knife directly at Ms. Thompson, the evidence is sufficient for a factfinder to rationally conclude that Mr. Levengood made an actual threat to use the knife on Ms. Thompson.  There is ample evidence in the record that Mr. Levengood did indeed raise the knife to slash, puncture, and pry at the locked bedroom door, behind which A.L. and Ms. Thompson sought refuge.  In spite of being twice refused entry, Mr. Levengood used the knife to attack the door and gain entry to the bedroom.  These circumstances justify a factfinder's rejection of Mr. Levengood's contention that his violent actions should be narrowly construed as an act of violence only to the bedroom door.  Instead, considering the undisputed facts presented at trial, a rational trier of fact could construe Mr. Levengood's slashing, puncturing, and prying at the bedroom door while demanding to be let in, as an actual threat—an expression of an intention to inflict pain, injury, or punishment towards Ms. Thompson.

## *CONCLUSION*

[¶25]  Affording every favorable inference to the evidence presented by the State at trial, we conclude that a rational trier of fact could find that, under the circumstances, Mr. Levengood's actions were an actual threat towards Ms. Thompson.  There is sufficient evidence to sustain the conviction and therefore we affirm.

7