2018 WY 3

**Tamani T'Angelis THOMPSON,
Appellant (Defendant),**

**v.**

**The STATE of Wyoming,
Appellee (Plaintiff).**

S-17-0079

Supreme Court of Wyoming.

January 17, 2018

Representing Appellant: Office of the Public Defender: Diane Lozano, State Public Defender; Tina N. Olson *, Chief Appellate Counsel; Kirk A. Morgan, Senior Assistant Appellate Counsel. Argument by Ms. Olson.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Caitlin F. Harper, Assistant Attorney General. Argument by Ms. Harper.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

KAUTZ, Justice.

[¶1] A jury convicted Tamani T'Angelis Thompson of three counts of aggravated assault and battery and one count of domestic battery (third offense) for an attack upon his girlfriend (hereinafter referred to as "the victim"). It acquitted him of one count of aggravated assault and battery. Mr. Thompson admitted his criminal record made him a habitual criminal. Consequently, the district court sentenced him to enhanced penalties under the habitual criminal statute.

[¶2] On appeal, Mr. Thompson claims there was insufficient evidence to support his aggravated assault and battery convictions. As to two of the counts, he asserts the evidence

*An order granting Ms. Olson's Motion to Withdraw was entered on December 13, 2017.*

did not support the jury's conclusion that he threatened the victim with a drawn deadly weapon. With regard to the other aggravated assault and battery count, Mr. Thompson claims there was insufficient evidence that the victim suffered a serious bodily injury. Mr. Thompson also maintains the district court committed reversible error when it allowed the jury to hear testimony from a domestic violence expert and evidence that the victim had been abused in prior relationships. Finally, he claims the district court imposed illegal sentences because the two felony convictions used for the habitual criminal enhancement were not separately brought and tried, or, in the alternative, that his counsel was ineffective for allowing Mr. Thompson to stipulate to the underlying felonies.

[¶3] We affirm.

### ISSUES

[¶4] Mr. Thompson raises the following issues on appeal, which we re-order to consider the issues regarding his convictions before considering the legality of his sentences:

I.  Was there insufficient evidence to support [Mr. Thompson's] two convictions of aggravated assault [and battery]—threatening with a drawn deadly weapon?

II.  Was there insufficient evidence that [the victim] suffered a "protracted" loss to support conviction on Count 4, aggravated assault and battery—serious bodily injury?

III.  Did reversible error occur when the testimony of a "domestic violence" expert was allowed and when irrelevant evidence of the alleged victim's ... past history was elicited and argued?

IV.  Has [Mr. Thompson] received an illegal sentence? Alternatively, was [Mr. Thompson's] trial counsel ineffective when he allowed [Mr. Thompson] to stipulate to the habitual criminal enhancement, when [Mr. Thompson's] two previous convictions were not separately tried?

The State articulates the same issues, although in more detail.

### FACTS

[¶5] Mr. Thompson and the victim lived together in Casper, Wyoming, for several months. In February 2016, Mr. Thompson began seeing an ex-girlfriend, and the victim kicked him out of the home. Mr. Thompson and the victim later reconciled, but he frequently stayed elsewhere. During this same period, Mr. Thompson introduced the victim to his friend who was living at Community Alternatives of Casper (CAC). The friend stayed at the victim's house on a "weekend pass" from CAC, and they had sex.

[¶6] On the evening of May 4, 2016, Mr. Thompson was at the house when the victim got home from work. She had had a bad day and asked Mr. Thompson to go buy her beer and some "Fireball" whiskey. He bought her a twenty-ounce bottle of beer and the whisky. They drank throughout the evening, and Mr. Thompson went out and bought the victim another bottle of beer, more beer for himself, and more whiskey.

[¶7] The victim and Mr. Thompson went to bed, and the victim awakened to being hit in the face and cursed at by Mr. Thompson. He looked at her phone and asked if she was "f***ing somebody." He continued to punch her in the face and head, and she put her hands up to protect herself.

[¶8] At some point during the assault, the victim offered Mr. Thompson the remainder of the beer in the bottle she had placed beside the bed earlier. He grabbed the beer bottle and said he was going to "smash" it over her head if she did not tell him the truth about having sex with his friend. She admitted that she "did it."

[¶9] Although Mr. Thompson did not raise the beer bottle like he was going to hit the victim with it and he set the bottle down without breaking it, he continued to assault her. She tried to leave the bedroom, but he pushed her back down on the bed. The victim said that he kicked or stomped her with his shoes. He then grabbed a clay art piece (sculpture) her daughter had made and said he was going to kill her or "smash [her] face in." She begged him not to hit her, and he set the clay art piece down.

[¶10] The victim was eventually able to retreat to the bathroom, but Mr. Thompson followed her and again punched her in the face and called her names. Mr. Thompson left the house, but threatened to come back and hurt or kill her if she called the police. Nevertheless, the victim called the police and sought help from her daughter who was asleep elsewhere in the house. The victim was transported by ambulance to the hospital emergency room. The police officers recorded many injuries to the victim's head, face, hands, arms, and sides. The victim saw her primary care physician a few days later and complained of difficulty hearing out of her left ear. A specialist subsequently diagnosed her as having a ruptured or perforated ear drum.

[¶11] The State charged Mr. Thompson with five felony counts. Counts One and Two alleged Mr. Thompson committed aggravated assault and battery by threatening to use drawn deadly weapons (beer bottle and clay art piece) on the victim. Count Three alleged he committed aggravated assault and battery by causing bodily injury to the victim with a deadly weapon (his shoes). Count Four alleged Mr. Thompson committed aggravated assault and battery by causing serious bodily injury to the victim. Count Five alleged Mr. Thompson battered a household member (third offense). As to each aggravated assault and battery charge, the State also alleged that Mr. Thompson was a habitual criminal because the charge was a violent felony and he had previously been convicted of felonies on two or more charges separately brought and tried.

[¶12] The case was tried to a jury in October 2016, and the jury convicted Mr. Thompson of all counts except Count Three. Mr. Thompson admitted that he previously had been convicted of two felonies separately brought and tried and the district court adjudged him a habitual criminal. The court sentenced him to prison terms of eighteen to twenty years on each of the aggravated as-

sault and battery convictions and three to five years on the domestic battery conviction, with all the sentences to run concurrently, Mr. Thompson filed a timely notice of appeal.

## DISCUSSION

### I. Sufficiency of the Evidence of Aggravated Assault and Battery

[¶13] Mr. Thompson was convicted of two counts of aggravated assault and battery for threatening to use a drawn deadly weapon upon the victim and one count of aggravated assault and battery for causing serious bodily injury to the victim. He moved, under W.R.Cr.P. 29, for judgments of acquittal on all three counts after the State rested, and again after the trial. The district court denied the motions.[1]

[¶14] Mr. Thompson claims the evidence was insufficient to support the jury's verdicts. In reviewing his challenges to the sufficiency of the evidence,

> [w]e do not consider "whether or not the evidence was sufficient to establish guilt beyond a reasonable doubt, but [instead] whether or not the evidence could reasonably support such a finding by the factfinder." *Hill v. State*, 2016 WY 27, ¶ 13, 371 P.3d 553, 558 (Wyo. 2016). "We will not reweigh the evidence nor will we re-examine the credibility of the witnesses." *Hill*, 2016 WY 27, ¶ 12, 371 P.3d at 558. We review the sufficiency of the evidence "from this perspective because we defer to the jury as the fact-finder and assume they believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt." *Oldman* [*v. State*], 2015 WY 121, ¶ 5, 359 P.3d [964,] 966 [ (Wyo. 2015) ].

*Mraz v. State*, 2016 WY 85, ¶ 19, 378 P.3d 280, 286 (Wyo. 2016) (quoting *Bean v. State*, 2016 WY 48, ¶ 45, 373 P.3d 372, 387 (Wyo. 2016)). (some citations omitted). *See also,*

---

1. Mr. Thompson does not directly challenge the district court's denial of his motions for judgment of acquittal. Although we often say that we *defer to the district court's decision denying a* motion for judgment of acquittal, we actually review the sufficiency of the evidence. Thus, re-

gardless of the way the issue is presented on appeal, we review the record to determine if there is sufficient evidence to support the jury's verdict. *See Foltz v. State*, 2017 WY 155, 407 P.3d 398 (Wyo. 2017).

*Blevins v. State,* 2017 WY 43, ¶ 7, 393 P.3d 1249, 1251 (Wyo. 2017).

> [T]his Court examines the evidence in the light most favorable to the State. We accept all evidence favorable to the State as true and give the State's evidence every favorable inference which can reasonably and fairly be drawn from it. We also disregard any evidence favorable to the appellant that conflicts with the State's evidence.

*Harnden v. State,* 2016 WY 92, ¶ 5, 378 P.3d 611, 612-13 (Wyo. 2016) (quoting *Pena v. State,* 2015 WY 149, ¶ 16, 361 P.3d 862, 866 (Wyo. 2015)).

*Worley v. State,* 2017 WY 3, ¶ 17, 386 P.3d 765, 771 (Wyo. 2017) (some citations omitted).

### A. Threatening to Use a Drawn Deadly Weapon

█ [¶15] Mr. Thompson was convicted of two counts under Wyo. Stat. Ann. § 6-2-502(a)(iii) (LexisNexis 2017) for threatening the victim with a beer bottle and a clay art piece. He claims the State did not present sufficient evidence that he actually threatened her with the objects. Section 6-2-502 states in relevant part:

(a) A person is guilty of aggravated assault and battery if he:

. . . .

(iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another[.]

█ [¶16] The "threatens to use" element in § 6-2-502(a)(iii) requires "proof of an actual threat of physical injury during the act of employing a deadly weapon." *Johnston v. State,* 747 P.2d 1132, 1134 (Wyo. 1987). *See also, Hill,* ¶ 15, 371 P.3d at 558-59; *Levengood v. State,* 2014 WY 138, ¶ 15, 336 P.3d 1201, 1204 (Wyo. 2014). The "mere presence" of a weapon is not sufficient to satisfy the "threatens to use" element of the crime. *Hill,* ¶ 15, 371 P.3d at 559 (citing *Gunderson v. State,* 925 P.2d 1300, 1304 (Wyo. 1996)). A threat under § 6-2-502(a)(iii) is " 'an expression of an intention to inflict pain, injury, or punishment. It may be expressed by words

or acts, or a combination of words and acts.' " *Hill,* ¶ 15, 371 P.3d at 559 (quoting *Johnston,* 747 P.2d at 1135). The jury may consider " 'all of the circumstances of the case [in deciding] whether the defendant's words and acts amounted to an express or implied statement of his intention to use a drawn deadly weapon to inflict pain, injury, or punishment.' " *Id.*

[¶17] The victim testified that she awoke to Mr. Thompson punching her. He had her phone and was upset because he had seen something on it indicating that she had sex with his friend. He asked her if she was "f***ing" someone and she responded by asking him who he was talking about. Mr. Thompson continued to punch the victim, and she attempted to shield her face with her hands. She testified:

> I was still saying I didn't know what he was talking about. I needed him to tell me what he was talking about. And, at that point, I looked over on my ledge, and—'cause the beer that I didn't finish—I asked him if he wanted it, and he said he would drink it. . . .
>
> He grabbed the bottle and he said, I will smash this over your head if you just don't—if you don't tell me the truth.

The prosecutor questioned her further:

Q. And where were you at this point?

A. On the bed.

Q. Naked?

A. Yes. . . . So I said okay. I did it, but you need to let me explain. . . .

[¶18] Mr. Thompson apparently set the beer bottle down without raising it as if to hit the victim or throwing it, but he continued to punch the victim. She tried to leave the room, but he pushed her back down on the bed. The victim testified:

A. I was—I was pushed back onto the bed, more hits. At some point, he kicked me. I felt him kicking me.

Q. Where was he kicking you?

A. In my side. He got up on the bed and straddled me, standing over me, and I felt him punching me over and over again, as he is calling me a whore and a—and a bitch. I felt his feet—not his feet, his shoes kicking my head.

He got off, and he went and he grabbed a sculpture that my daughter made me for Mother's Day. And said he was going to kill me or smash my face in. At that point, I removed my hands and I said, Tamani, please, no. And he sat it down.

. . . .

[¶19] Mr. Thompson claims that his verbal threats while holding the beer bottle and art piece were insufficient to sustain his convictions for threatening the victim with a drawn deadly weapon. He states that, "[w]hile deplorable, [his] words alone, with no threatening gesture, are insufficient evidence to sustain these two convictions." Mr. Thompson cites two Illinois cases in support of his argument. In *People v. Ferguson*, 181 Ill.App.3d 950, 130 Ill.Dec. 551, 537 N.E.2d 880 (1989), an Illinois court of appeals upheld the appellant's conviction for assault. Under the relevant statute, "an assault occurs when a person engages in conduct which places another in reasonable apprehension of receiving a battery (Ill.Rev.Stat.1985, ch. 38, par. 12-1(a))." *Id.*, 130 Ill.Dec. 551, 537 N.E.2d at 882. The court described Ferguson's actions as follows:

Defendant drove up to the gate about 5 p.m. seeking admission to play golf. When Norwood informed him that he could not enter and would have to park his car on the street, defendant jumped out of his car, and stood within three inches of Norwood's face, cursing at him and telling him that he was going to drive his car into the lot regardless of what Norwood said. Defendant then got back into his car and began to drive it, but Norwood would not move. Defendant pushed his car into Norwood, got out again, then ran to his trunk telling Norwood that if he would not move, defendant had something to move him. Defendant opened his trunk, then came back to where Norwood was standing, and within striking distance, told Norwood that he was going to "kick his ass." At trial, Norwood stated that he thought defendant was going to hit him at that point.

*Id.*, 130 Ill.Dec. 551, 537 N.E.2d at 881. The court of appeals remarked that, although words alone are insufficient to establish an assault under the statute, the combination of Ferguson's words and conduct were sufficient for the trier of fact to conclude the victim was placed in "reasonable apprehension of receiving a battery." *Id.*, 130 Ill.Dec. 551, 537 N.E.2d at 882.

[¶20] The other case cited by Mr. Thompson is *People v. Floyd*, 278 Ill.App.3d 568, 215 Ill.Dec. 324, 663 N.E.2d 74 (1996). In *Floyd*, the court stated that words alone are usually insufficient to constitute an assault under the Illinois statute and reversed Floyd's assault conviction. *Id.*, 215 Ill.Dec. 324, 663 N.E.2d at 76-77. The evidence showed that Floyd stopped his bicycle and stared at a woman across the street for two to three minutes. He then crossed the street, rode up next to her and said, "[y]ou come here, you." *Id.*, 215 Ill.Dec. 324, 663 N.E.2d at 75. Although the victim testified that she was petrified and believed Floyd wished to do her "bodily harm," the court stated that it did not believe "the words used by defendant, even coupled with the fact that he rode his bicycle toward [the victim], [rose] to the level of assault." *Id.*, 215 Ill.Dec. 324, 663 N.E.2d at 75-76. Although the Illinois court's analysis is interesting, the statutory language is nothing like the language of § 6-2-502(a)(iii). Consequently, it is difficult to draw any parallels between the cases relied upon by Mr. Thompson and the present case.

[¶21] Wyoming precedent interpreting § 6-2-502(a)(iii) allows the jury to consider all the circumstances in determining whether the defendant threatened to use a deadly weapon. Jury Instruction No. 18 stated:

"Threatens to use" means more than mere presence of a weapon. The phrase "threatens to use" requires proof beyond a reasonable doubt of an actual threat of physical injury during the act of employing a deadly weapon.

A threat may be expressed by words or acts or a combination of words and acts.

This instruction, which is a correct statement of the law under *Hill* and *Johnston, supra,* directed the jury to look at Mr. Thompson's words and/or actions to determine whether he threatened to use a drawn deadly weapon on the victim.

[¶22] In *Levengood*, ¶¶ 19-24, 336 P.3d at 1205-06, we emphasized the context of the defendant's actions in upholding an aggravated assault and battery conviction for threatening to use a drawn deadly weapon. The evidence showed that Levengood, who was a large man and highly intoxicated, used a knife to hack at the door frame of the room where the two victims were hiding and then forced his way through the locked door into the room. Even though there was no evidence that Levengood raised the knife as if to use it on the victims after he entered the room, we concluded a reasonable jury could have found the elements of § 6-2-502(a)(iii) were satisfied.

[¶23] Like in *Levengood*, there was no evidence that Mr. Thompson lifted the bottle or art piece as if to immediately strike the victim; however, he made it very clear that he intended to use the weapon in his hand to "kill" her or "smash" her head or face. Furthermore, Mr. Thompson made the statements in the midst of a brutal attack on the victim. His combined words and actions expressed his intention to inflict pain, injury, or punishment upon the victim with the deadly weapons.[2] *See Hill*, ¶ 15, 371 P.3d at 559; *Johnston*, 747 P.2d at 1135. Considering the trial evidence in the light most favorable to the State, it was reasonable for the jury to conclude the State had proven that Mr. Thompson threatened to use the beer bottle and clay art piece to harm the victim.

[¶24] Mr. Thompson also argues that the evidence was insufficient because a beer bottle and clay art piece are not weapons that can be drawn. He candidly acknowledges that he did not present this argument to the district court. Generally, in the absence of a "fundamental error affecting a substantial right of the appellant, an issue raised for the first time on appeal will not be considered." *Belden v. State*, 2003 WY 89, ¶ 55, 73 P.3d 1041, 1090 (Wyo. 2003) (citations omitted). *See also, Gompf v. State*, 2005 WY 112, ¶ 16, 120 P.3d 980, 985 (Wyo. 2005); *Poitra v. State*, 2016 WY 20, ¶¶ 15-19, 368 P.3d 284, 288-89 (Wyo. 2016). The rationale behind this rule is that "it is unfair to reverse a ruling of a trial court for reasons that were not presented to it, whether it be legal theories or issues never formally raised in the pleadings nor argued to the trial court." *Silva v. State*, 2014 WY 155, ¶ 9, 338 P.3d 934, 936-37 (Wyo. 2014) (quoting *Belden v. Lampert*, 2011 WY 83, ¶ 11, 251 P.3d 325, 328-29 (Wyo. 2011)).

[¶25] However, we stated in *Garay v. State*, 2007 WY 130, ¶ 2, n.1, 165 P.3d 99, 101, n.1 (Wyo. 2007), "the proposition that a defendant's guilt must be proved with competent evidence bearing upon each of the crime's elements always involves a fundamental right." Consequently, we do not apply waiver to a claim that the evidence was legally insufficient to support the defendant's conviction. *See generally, Hawes v. State*, 2014 WY 127, ¶ 8, 335 P.3d 1073, 1076 (Wyo. 2014) (holding that, although the appellant did not renew his motion for judgment of acquittal after presenting evidence, his claim that the evidence was insufficient to support his conviction was still reviewable on appeal).

[¶26] The State argues that, given Mr. Thompson failed to make this argument in support of his motion for judgment of acquittal, we should review for plain error. This question is also answered by *Garay*, ¶ 2, n.1, 165 P.3d at 101, n.1. In addition to stating that a defendant's right to demand that his conviction be supported by sufficient evidence is always fundamental, we noted that plain error review does not fit a sufficiency of the evidence argument because there is no "incident" alleged to be error; the "clear and unequivocal rule of law" element of plain error is not consistent with our standard for reviewing the sufficiency of the evidence; and "a defendant is always prejudiced if he is found guilty and the evidence is not sufficient to establish his guilt." *Id. See also, Pena v. State*, 2013 WY 4, ¶ 29, n.2, 294 P.3d 13, 18, n.2 (Wyo. 2013) (applying the sufficiency of the evidence standard of review on appeal even though the defendant had not moved for a judgment of acquittal at any stage of the trial proceedings). We will, therefore, use our

---

2. Mr. Thompson does not challenge the jury's conclusion that the beer bottle and clay art piece were deadly weapons.

typical sufficiency of the evidence standard to review Mr. Thompson's argument that the evidence was legally insufficient to support his convictions because the bottle and clay art piece were not weapons capable of being "drawn" under the statute.

[¶27] Mr. Thompson points out that the majority of our § 6-2-502(a)(iii) cases involve guns or knives. Thus, he claims this statutory section applies only when a defendant threatens to use a deadly weapon that can be "taken . . . or pulled out from some sheath or pocket or some secreted location." Mr. Thompson asserts that *Ewing v. State,* 2007 WY 78, 157 P.3d 943 (Wyo. 2007), confirms that a beer bottle or art piece cannot be "drawn" as contemplated by the statute. To the contrary, the *Ewing* decision supports a conclusion that Mr. Thompson's actions fell within the statute's prohibition.

[¶28] Several officers tried to enter a shed to arrest Ewing, and he stated that anyone who opened the door was "going to get shot." When the officers finally gained entry to the shed, they found an apparently unloaded rifle on a shelf. A witness testified that, two days earlier, she had seen the rifle on the floor of the shed behind some things. The prosecution charged him with aggravated assault and battery for threatening to use a drawn deadly weapon. *Ewing,* ¶¶ 4-5, 12, 157 P.3d at 944-46.

[¶29] Ewing argued that, because no one actually saw him with the gun in his hand, there was no way to establish that he had drawn the weapon. We explained,

> it was the jury's task to apply the common meaning of the word "drawn" to the situation at hand. *Webster's International Dictionary* defines "draw" as follows: "[verb]1 . . . f: to remove (a weapon) from a sheath <now° your swords and fall to it>." *Webster's Third New International Dictionary* 686 (1993). A more recent abridged version of *Webster's* dictionary defines "draw" as "*vt.* . . . 5a. To take or pull out for use, as a weapon . . . *vi.* . . . 4. To pull out a weapon for use." *Webster's II New College Dictionary* 350–51 (3d ed.2005). Similarly, *Merriam–Webster's Collegiate Dictionary* 352 (10th ed.1995) defines "draw" in this context as "to bring out a weapon (*drew,*

aimed, and fired)." **We are satisfied from reviewing these sources that the common meaning of "drawn" does not contain the element of aiming or pointing[.]**

*Ewing,* ¶ 13, 157 P.3d at 946 (emphasis added). *See also, Hart v. State,* 2003 WY 12, ¶ 6, 62 P.3d 566, 569 (Wyo. 2003); *Hill,* ¶¶ 19-20, 371 P.3d at 559-60.

[¶30] This Court concluded the jury reasonably could have inferred that Ewing had drawn the rifle based upon his statement that he would shoot the officers who came in the door and evidence that the rifle had been moved from its previous location and placed on the shelf next to him. He had placed the rifle in a position where it could be used to carry out his threat. *Ewing,* ¶ 15, 157 P.3d at 947.

[¶31] Although, as Mr. Thompson argues, the definition of "drawn" clearly contemplates unsheathing a knife or removing a gun from a holster or pocket, it also includes taking, pulling or bringing out other types of items that can be used as deadly weapons. In *Ewing,* the jury was allowed to infer that the gun was drawn from evidence that he had picked it up off the floor and put it on the shelf, a place where it was available for use. The same is true of the beer bottle and clay art piece in the case at bar. Mr. Thompson grasped the items, making them available to "kill" the victim or "smash" over her head in accordance with his verbal threats.

[¶32] If the legislature had intended to limit the weapons a defendant could use to violate § 6-2-502(a)(iii) to guns or knives, it would have specifically listed those in the statute. Instead, it used the more general term, "deadly weapon," which is defined by statute as including, but not limited to, "a firearm, explosive or incendiary material, motorized vehicle, an animal or other device, instrument, material or substance, which in the manner it is used or is intended to be used is reasonably capable of producing death or serious bodily injury." Section 6-1-104(a)(iv). The legislature did not limit the types of deadly weapon that can be used to commit the crime set out in § 6-2-502(a)(iii), and we do not add language to a statute that the legislature chose to omit. *Wyodak Res.*

*Dev. Corp. v. Wyo. Dep't of Revenue,* 2017 WY 6, ¶ 31, 387 P.3d 725, 733 (Wyo. 2017).

[¶33] Furthermore, we have indicated that other types of weapons that cannot be "drawn" in the narrow sense advocated by Mr. Thompson can be used in violation of § 6-2-502(a)(iii). For example, in *Urbigkit v. State,* 2003 WY 57, ¶¶ 41-48, 67 P.3d 1207, 1223-26 (Wyo. 2003) (abrogated on other grounds by *TJS v. State,* 2005 WY 68, 113 P.3d 1054 (Wyo. 2005)), this Court affirmed two convictions under § 6-2-502(a)(iii) for threatening to use a drawn deadly weapon, with the deadly weapon being a vehicle. *See also, Kidwell v. State,* 2012 WY 91, 279 P.3d 540 (Wyo. 2012) (Kidwell was acquitted of threatening to use a hammer as a drawn deadly weapon but we did not suggest that threatening with a hammer would not fall under the statute). We, therefore, reject Mr. Thompson's request that we conclude, as a matter of law, the evidence was insufficient to convict him of threatening to use the beer bottle and clay art piece as drawn deadly weapons.

## B. Serious Bodily Injury—Protracted Loss or Impairment of Bodily Function

[¶34] The jury convicted Mr. Thompson of one count of aggravated assault and battery for causing the victim serious bodily injury under § 6-2-502(a)(i):

(a) A person is guilty of aggravated assault and battery if he:

(i) Causes or attempts to cause serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]

As pertinent to this case, "[s]erious bodily injury" means "bodily injury which [c]auses . . . protracted loss or impairment of a bodily function[.]" Section 6-1-104(a)(x)(C). "Bodily injury" means:

(A) A cut, abrasion, burn or temporary disfigurement;

(B) Physical pain; or

(C) Impairment of the function of a bodily member, organ or mental faculty.

Section 6-1-104(a)(i) (LexisNexis 2017).

[¶35] The victim testified that, during the attack on May 5, 2016, Mr. Thompson hit her in the side of the head and blood later drained from her ear. At an appointment with her primary care provider a few days later, the victim complained of hearing loss in that ear. The victim saw an ear, nose and throat specialist on May 21, 2016 (16 days after the attack). He diagnosed her with a perforated ear drum and testified that such an injury can result from being struck on the side of the head with a cupped hand. This motion introduces a sudden blast of air into the ear canal, where the pressure can rupture the ear drum and cause bleeding and drainage from the ear.

[¶36] The specialist testified that about twenty percent of the victim's ear drum surface was perforated and, as a result, she suffered from hearing loss. He said that many such injuries resolve with time, so he typically waits thirty days to see if the ear drum will heal on its own before deciding to perform surgery. The victim testified that she had complete hearing loss in her left ear for about a month. A hearing test conducted the week before trial showed that her perforated ear drum had healed.

[¶37] The State asserted the victim suffered a serious bodily injury because her hearing loss amounted to a "protracted loss or impairment of a bodily function." Section 6-1-104(a)(x)(C). Mr. Thompson claims there was insufficient evidence that the victim's hearing loss was "protracted" because her ear drum healed within the normal time it takes to heal such an injury. The term "protracted" was not defined for the jury, so we assume it applied the common meaning of the term. *Ewing,* ¶ 13, 157 P.3d at 946. Protracted means "continuing for a long time, esp. longer than is normal or necessary." Websters Third New Int'l Dictionary 1826 (2002). The term "lengthy" is a synonym of "protracted." www.thesaurus.com.

[¶38] Other jurisdictions have considered the definition of protracted under statutes which define serious bodily or physical injury to include protracted impairment of a

bodily function. Missouri defines protracted as "something short of permanent but more than of short duration." *State v. Raines*, 118 S.W.3d 205, 210 (Mo. Ct. App. 2003). Raines assaulted the victim, rupturing her tympanic membrane (ear drum). There was apparently some evidence that the victim suffered permanent partial hearing loss. *Id.* at 208. However, in analyzing the sufficiency of the evidence on the protracted nature of her hearing loss, the court remarked that the victim suffered hearing loss that extended, at a minimum, from the termination of the attack until the doctor treated her the next morning. *Id.* at 208, 210. The Missouri court ruled that evidence was sufficient to support Raines' conviction for second degree assault based upon protracted loss of hearing. *Id.*

[¶39] Indiana defines "protracted impairment" as a "damaged, weakened, or diminished" state of being that is drawn out or lengthened in time. *Mann v. State*, 895 N.E.2d 119, 122 (Ind. Ct. App. 2008). The Indiana court of appeals held the victim's testimony that he suffered from "muffled hearing" for approximately two months after the defendant attacked him was sufficient to uphold Mann's aggravated battery conviction. *Id.*

[¶40] Mr. Thompson argues that, to satisfy the protracted impairment element, the evidence must show the underlying injury took longer than normal to heal. That is not what the statute states. It does not say that the healing of the injury must be protracted; it states that the impairment must be protracted. Under Mr. Thompson's definition, a defendant could inflict any manner of severe injury which causes an impairment but, because the victim heals within the "normal" timeframe, the defendant could not be convicted of aggravated assault and battery under § 6-2-502(a)(i). We reject Mr. Thompson's interpretation of the statutory language. Using the standard definition of protracted, the State must prove the victim suffered a long or lengthy impairment of a bodily function.

[¶41] Whether an impairment lasted for a long or lengthy time is, obviously, very dependent upon the facts of the case, making it quintessentially a jury question. The jury in this case was instructed on the statutory definitions of "bodily injury" and "serious bodily injury" and could, therefore, compare the different degrees of bodily injury in determining whether the victim's injury was serious. The jury had to decide if the victim had simply suffered an impairment of her hearing or if the impairment was protracted because it lasted a long or lengthy time.

[¶42] The victim testified that she did not have any hearing in her left ear after being assaulted by Mr. Thompson. The specialist confirmed the hearing loss and diagnosed her with a perforated ear drum.[3] The victim testified that her hearing returned approximately a month after the assault. We acknowledge, as did the district court, that the facts supporting the "protracted impairment" are not overwhelming. However, our task is not to reweigh the evidence. Instead, under our standard of review, the evidence is sufficient to support a conviction if, giving it every favorable inference, we can conclude that it reasonably supports the jury's verdict. *Mraz*, ¶¶ 18-19, 378 P.3d at 286; *Worley*, ¶ 17, 386 P.3d at 771. Under this standard of review, the jury could have found that the victim's injury was serious because her complete loss of hearing in one ear for a month was sufficiently lengthy to be categorized as a protracted impairment of a bodily function.

[¶43] Mr. Thompson claims his situation is similar to *Martinez v. State*, 2009 WY 6, 199 P.3d 526 (Wyo. 2009). There, the alleged serious bodily injury under § 6-2-502(a)(i) was "severe disfigurement," resulting from a cracked cheek bone and non-displaced fracture to the right sinus. One of the victim's friends observed that the side of her face where the bone was cracked looked a little "flatter" than the other side. However, a radiologist testified the sinus fracture was subtle and non-displaced and would not be noticeable when looking at the victim. *Id.*,

---

**3.** Mr. Thompson counters the victim's testimony by pointing out that the specialist testified that her hearing loss was mild to moderate. However, that testimony was elicited by the defense on cross examination. Under our standard of review, we take the State's evidence as true and disregard any contrary evidence favorable to the appellant. *See Worley*, ¶ 17, 386 P.3d at 771.

¶¶ 5-6, 199 P.3d at 529. We held that, although the victim had several injuries as a result of the beating by the appellant, she had not suffered severe disfigurement. *Id.,* ¶¶ 3-4, 16, 199 P.3d at 528-29, 533. Given it considered a different type of "serious bodily injury," *Martinez* is of limited assistance in determining the matter at issue here. Furthermore, unlike in *Martinez* where there was very little evidence of severe disfigurement, the evidence in this case was such that a reasonable jury could find that the victim had suffered a "protracted impairment of a bodily function."

## II. Domestic Violence Evidence

[¶44] Mr. Thompson asserts the district court committed reversible error by allowing an expert to testify generally about domestic abuse victims' behavior and allowing the victim and her daughter to testify about the victim's past domestic abuse experiences. He claims the testimony was irrelevant to the issues presented at trial because the victim did not recant and there was no evidence that he had abused the victim prior to the charged assaults. Mr. Thompson asserts his defense was prejudiced by the evidence because it made the jury "feel sympathy" for the victim and "anger toward Mr. Thompson." The State argues the evidence was relevant to explain the victim's behavior and assist the jury in assessing her credibility.

[¶45] Mr. Thompson objected to the domestic violence expert, but he did not object to the victim's and her daughter's testimony. When an objection is made to evidence offered at trial, the district court's ruling on admissibility is committed to its sound discretion. *Griggs v. State,* 2016 WY 16, ¶ 81, 367 P.3d 1108, 1132 (Wyo. 2016). We reverse only when we conclude the district court abused its discretion.

We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. *Griswold v. State,* 2001 WY 14, ¶ 7, 17 P.3d 728, ¶ 7 (Wyo.2001). Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Id.* "In the absence of an abuse of discretion, we will not disturb the trial court's determination." *Id.* The burden is on the defendant to establish such abuse. *Trujillo [v. State],* 2 P.3d [567,] 571 [ (Wyo. 2000) ].

*Lopez v. State,* 2004 WY 103, ¶ 21, 98 P.3d 143, 149 (Wyo. 2004).

[¶46] When an appellant did not object to the evidence, we apply the plain error standard to review the claim on appeal. "To establish plain error, appellant must demonstrate 'violation of a clear and unequivocal rule of law, clearly reflected in the record, resulting in the abridgment of a substantial right of the party to his material prejudice.' " *Cazier v. State,* 2006 WY 153, ¶ 40, 148 P.3d 23, 35 (Wyo. 2006) (quoting *Belden,* ¶ 38, 73 P.3d at 1087). Although the two arguments have different standards of review, they are related, so we will consider them together.

[¶47] Under W.R.E. 402, relevant evidence is generally admissible. W.R.E. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Specifically with regard to expert witness testimony, a qualified expert witness[4] may testify about "scientific, technical, or other specialized knowledge" if such testimony will help the jury understand the case. W.R.E. 702. We have previously found that expert testimony explaining typical behavior of battered or abused persons can be relevant in helping the jury understand the victim's behavior. *See generally, Dean v. State,* 2008 WY 124, 194 P.3d 299 (Wyo. 2008).

[¶48] The State called the executive director of Crook County Family Violence

4. Mr. Thompson does not argue that the expert witness was not qualified or the testimony was otherwise inadmissible under the rules of evidence pertaining specifically to expert testimony, W.R.E. 702-706, or related case law. *See Bunting v. Jamieson,* 984 P.2d 467 (Wyo. 1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

and Sexual Assault Services as its first witness at trial. She testified about her training in domestic violence matters and explained that victims often behave in ways that are "counterintuitive." She provided several examples of such counterintuitive behavior including staying in an abusive relationship, recanting statements of violence, refusing to cooperate with law enforcement, and minimizing or denying abuse. She also testified that victims frequently "rank" their relationships in terms of the severity of the abuse and may not leave abusive relationships because they do not "know what a healthy relationship is." The expert's testimony was limited to general descriptions of perpetrator and victim behavior; she did not testify about the specific facts of this case.

[¶49] The victim's daughter also testified for the State. In addition to describing what she observed on the night of the assault, the daughter testified about the relationship between her mother and Mr. Thompson. She stated that, in the beginning, Mr. Thompson and her mother had a very loving relationship. After a time, the relationship changed. Mr. Thompson cheated on the victim with his ex-girlfriend, but, despite the infidelity, the victim continued to take "him back." The State also questioned the daughter about violence her mother had endured prior to becoming involved with Mr. Thompson.

[¶50] The victim testified about growing up in an abusive household and being involved in abusive relationships. She also testified about her relationship with Mr. Thompson, the assault, and her interactions with him both before and after the assault. The victim stated that she had spoken with Mr. Thompson more than fifty times between the time of the assault and the trial, sometimes about the case. She testified that, at times, she refused to cooperate with the prosecution because she loved Mr. Thompson and believed he could be "helped." She stated that she told the prosecutor that she did not want to "have any more involvement" with the prosecution and had "advocated for [Mr. Thompson] hard." There was no evidence that Mr. Thompson had abused the victim prior to the charged episode.

[¶51] Mr. Thompson seems to be arguing that the expert's testimony would have been relevant only if the victim had recanted or there was a history of him abusing the victim. However, the expert testified about types of counterintuitive behaviors other than recanting, including staying in an abusive relationship because it was better than past relationships and minimizing the abuse after the fact. The expert testimony helped explain why the victim would endure a brutal beating and then keep in touch with the perpetrator and try to help his legal situation.

[¶52] The victim's and her daughter's testimony about the victim's past relationships also helped to explain the victim's actions, especially when considered in light of the expert's description of victims who have numerous abusive relationships and may refuse to leave or minimize the severity of the abuse because they do not understand healthy relationships. In *Dean*, ¶¶ 21-26, 194 P.3d at 305-11, we acknowledged that victim behavior can be influenced by past abusive relationships. *See also*, *State v. Ankeny*, 358 Mont. 32, 243 P.3d 391, 399 (2010) (allowing testimony about the victim's prior abusive relationship to establish she was a battered woman and aid in explaining why she would later recant the allegations of abuse against her current boyfriend). Therefore, the testimony by the expert, the victim and her daughter was relevant to explain the victim's actions to the jury.

[¶53] We do, however, find it troubling that the State called the expert as its first witness at trial. We stated in *Dean* that

> before expert testimony about battered woman syndrome becomes relevant, an evidentiary foundation must first be established that the victim is a battered woman and that her conduct is such that the jury would be aided by expert testimony providing an explanation therefor.

*Dean*, ¶ 26, 194 P.3d at 306 (quoting *State v. Yusuf*, 70 Conn.App. 594, 800 A.2d 590, 608 (2002)). Here, the prosecutor did not provide proper foundation for the expert's testimony. The prosecutor explained to the district court how the jury would be aided by expert testi-

mony about victim behavior, but he did not present evidence that the victim was a battered woman before calling the expert to testify. Although it was error for the district court to allow the testimony without the proper foundation, we find the error harmless. The daughter's and the victim's testimony clearly established that the victim had a history of violent relationships. The foundational information, therefore, was eventually provided to the jury, making the expert testimony admissible.[5] We conclude, therefore, that the district court did not commit reversible error by allowing the expert to testify about victim behavior and did not commit plain error by allowing the victim and her daughter to testify about her past abusive relationships.

### III. Habitual Criminal

[¶54] Mr. Thompson claims the district court imposed an illegal sentence when it enhanced the penalty for his crimes under the habitual criminal statute.

> Sentencing decisions are normally within the discretion of the trial court. *Bitz v. State*, 2003 WY 140, ¶ 7, 78 P.3d 257, 259 (Wyo. 2003). "Such discretion is limited, however, inasmuch as a court may not enter an illegal sentence. A sentence is illegal if it violates the constitution or other law." *In re CT*, 2006 WY 101, ¶ 8, 140 P.3d 643, 646 (Wyo. 2006) (internal case citation omitted). Whether a sentence is illegal is a question of law, which we review *de novo. Manes v. State*, 2007 WY 6, ¶ 7, 150 P.3d 179, 181 (Wyo. 2007).

*Endris v. State*, 2010 WY 73, ¶ 13, 233 P.3d 578, 581 (Wyo. 2010) (quoting *Jackson v. State*, 2009 WY 82, ¶ 6, 209 P.3d 897, 898–99 (Wyo. 2009).)

*Barela v. State*, 2016 WY 68, ¶ 6, 375 P.3d 783, 785-86 (Wyo. 2016).

[¶55] Wyo. Stat. Ann. § 6-10-201 (LexisNexis 2017) provides enhanced penalties for habitual criminals. Section 6-10-201(a) states:

(a) A person is an habitual criminal if:

(i) He is convicted of a violent felony; and

(ii) He has been convicted of a felony on two (2) or more previous charges separately brought and tried which arose out of separate occurrences in this state or elsewhere.

Under § 6-10-201(b), a habitual criminal shall be punished by imprisonment for ten to fifty years for a violent felony if he has two prior convictions and life if he has three or more prior convictions for offenses committed after he reached the age of eighteen years.

[¶56] The State alleged that Mr. Thompson was a habitual criminal because he had two prior felony convictions for battery (third offense) under Wyo. Stat. Ann. § 6-2-501(b) and (f)(ii) (LexisNexis 2007, repealed by Laws 2014, ch. 13, § 3). Mr. Thompson admitted the two prior convictions. However, he claims on appeal that the convictions were not "separately brought and tried" because they were resolved in a single plea agreement and judgment and sentence.

[¶57] Mr. Thompson was charged in the First Judicial District Court, Laramie County, Wyoming, Docket No. 29-614, with one count of battery under § 6-2-501(b) and (f)(ii) (LexisNexis 2007) for battering a household member on July 4, 2007. On August 6, 2007, Mr. Thompson pleaded guilty to the charge in No. 29-614, in accordance with a plea agreement. However, the State withdrew the plea agreement after he violated his bond conditions. Mr. Thompson was separately charged in the First Judicial District Court, Laramie County, Wyoming, Docket No. 29-707 for battering a household member on October 7, 2007. Mr. Thompson and the

---

**5.** Mr. Thompson makes a very brief argument that the probative value of the expert testimony was outweighed by its prejudicial effect. W.R.E. 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Mr. Thompson does not even cite to Rule 403 in his brief, and his conclusory statements do not amount to cogent argument. Consequently, we decline to determine whether the evidence should have been excluded under the balancing test in Rule 403. *See Contreras v. State*, 7 P.3d 917, 921 (Wyo. 2000) (refusing to consider an argument that evidence should have been excluded under Rule 403 when the appellant did not provide cogent argument or pertinent authority in support of his assertion).

State entered into a plea agreement that addressed both charges on November 5, 2007, and he entered a guilty plea in No. 29-707 that same day. Mr. Thompson's guilty plea from August 2007 in No. 29-614 remained in place. The district court entered a single "Judgment and Sentence" for both counts; however, separate convictions and sentences were imposed for the two crimes and the court ordered the sentences to be served consecutively. Specifically, in No. 29-614, the court sentenced Mr. Thompson to eighteen to thirty-six months in prison with credit for time served. In No. 29-707, the court sentenced him to four to five years in prison, suspended the sentence, and ordered him to serve five years of supervised probation after he completed the term of parole in No. 29-614.

[¶58] In *Keene v. State*, 812 P.2d 147, 151 (Wyo. 1991), we addressed whether the appellant's prior Colorado convictions for robbery and a bail bond violation were separate predicate felonies under the habitual criminal statute. Keene argued that the charges were not separately brought and tried because he had entered guilty pleas to the charges on the same day and was sentenced for both at the same time. We stated that, when a defendant pleads guilty to two entirely separate crimes that occurred at different times, they are treated as two convictions "separately brought and tried" under the habitual offender statute even though they are resolved at the same time. *Keene*, 812 P.2d at 151-52 (citing *Connor v. State*, 537 P.2d 715, 719 (Wyo. 1975)). The requirement that the convictions be "separately brought" was satisfied because the offenses were "spatially and temporally separate" transactions and the charges were brought in separate informations. *Id.* We distinguished *Green v. State*, 784 P.2d 1360, 1364-65 (Wyo. 1989), where three Kansas convictions were treated as one for purposes of the habitual criminal statute because, unlike in *Keene*, they all arose from a single occurrence and were tried together. *Green*, 784 P.2d at 1364-65.

[¶59] The Colorado Supreme Court interpreted statutory language similar to Wyoming's in *Gimmy v. People*, 645 P.2d 262, 267 (Colo. 1982) (en banc). The *Gimmy* court concluded the requirement that predicate felonies be separately brought was satisfied because they arose out of separate criminal incidents and were charged in separate informations with separate docket numbers. Even though the charges were resolved in the same guilty plea proceeding, the Colorado Supreme Court concluded the prior convictions satisfied the "separately tried" requirement because, had the defendant chosen not to plead guilty, the charges would have been tried in separate trials. *Id.*

[¶60] The situation in the case at bar is like *Keene* and *Gimmy* and unlike *Green*. Mr. Thompson was convicted of two counts of battery that arose from separate occurrences months apart and were charged in different informations. Mr. Thompson entered his guilty pleas to the two charges in separate proceedings and was sentenced separately for each docket number, with the sentences to be served consecutively. The fact that the two convictions were resolved together in a single plea agreement and judgment and sentence did not change the fact that they were separately brought and would have been separately tried had Mr. Thompson elected not to plead guilty. *See Gimmy, supra.* The district court did not illegally sentence Mr. Thompson under the habitual criminal statute.

[¶61] Mr. Thompson argues, in the alternative, that defense counsel was ineffective for "allowing the stipulation to the habitual criminal enhancement."[6] He did not file a motion under W.R.A.P. 21, so the district court did not consider his ineffective assistance of counsel claim. We, therefore, consider the issue *de novo. See Galbreath v. State*, 2015 WY 49, ¶ 4, 346 P.3d 16, 18 (Wyo. 2015). *Compare, Worley*, ¶ 9, 386 P.3d at 769 (applying the clearly erroneous standard to review the district court's findings of fact when considering a claim of ineffective assistance of counsel after a Rule 21 hearing).

[¶62] In order to establish that he received ineffective assistance of counsel, a

---

6. Counsel did not simply allow Mr. Thompson to stipulate to the enhancement. Mr. Thompson admitted under oath after the district court advised him of his rights that the convictions were valid.

defendant must show that his counsel's performance was deficient and he was prejudiced by the deficient performance. *Worley,* ¶ 10, 386 P.3d at 769. "Prejudice is established if 'a reasonable probability exists that, but for counsel's deficient performance, the outcome would have been different.'" *Griggs,* ¶ 36, 367 P.3d at 1124 (quoting *Osborne v. State,* 2012 WY 123, ¶ 19, 285 P.3d 248, 252 (Wyo. 2012)).

[¶63] Mr. Thompson claims defense counsel's stipulation amounted to deficient performance because the convictions were not separately brought and tried as required by the habitual criminal statute and he was prejudiced because his sentences were enhanced based upon the stipulation. Given we have already determined that the charges were separately brought and tried, counsel's stipulation had no effect upon the outcome. Consequently, Mr. Thompson cannot establish that he received ineffective assistance of counsel.

## CONCLUSION

[¶64] The State presented sufficient evidence to support Mr. Thompson's convictions for aggravated assault and battery by threatening to use a drawn deadly weapon. The evidence established that Mr. Thompson threatened to use drawn deadly weapons (a beer bottle and a clay art piece) on the victim. The State also presented sufficient evidence to support Mr. Thompson's conviction of aggravated assault and battery for causing serious bodily injury because his assault resulted in the victim's protracted hearing loss.

[¶65] The district court did not commit reversible error by allowing a domestic violence expert to testify even though, prior to the expert's testimony, the State should have provided a proper foundation showing the victim had a history of abuse. Mr. Thompson was not prejudiced by the error because evidence presented later in the trial provided a proper foundation. Additionally, the district court did not err by allowing the victim and her daughter to testify about the victim's past abusive relationships. The evidence was relevant to explain the victim's behavior.

[¶66] Finally, the district court properly enhanced the penalties for Mr. Thompson's aggravated assault and battery convictions because he had been convicted of two prior felonies separately brought and tried even though they were resolved in a single plea agreement and judgment and sentence. Given the enhanced sentences were appropriate, Mr. Thompson's counsel was not ineffective for stipulating to the prior convictions.

[¶67] Affirmed.