# THE SUPREME COURT, STATE OF WYOMING

# 2023 WY 124

OCTOBER TERM, A.D. 2023

December 19, 2023

KRISTINA EILEEN CROY,

**Appellant**
**(Defendant),**

**v.**

S-22-0312

THE STATE OF WYOMING,

**Appellee**
**(Plaintiff).**

*Appeal from the District Court of Laramie County*
*The Honorable Peter H. Froelicher, Judge*

*Representing Appellant:*
    *Dion J. Custis of Dion J. Custis, P.C., Cheyenne, Wyoming.*

*Representing Appellee:*
    *Bridget L. Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General.  Argument by Ms. Jones.*

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1]   Following a jury trial, Kristina Croy was found guilty of involuntary manslaughter.  She appeals, claiming there was insufficient evidence to support the jury's verdict.  She also asserts the district court abused its discretion when it dismissed a juror prior to deliberations and when it allowed the State to present an extensive rebuttal argument after making a short initial closing summation.  We affirm.

## ISSUES

[¶2]   Ms. Croy raises three issues which we rephrase as follows:

> I.   Was there sufficient evidence to support the jury's verdict?
>
> II.  Did the district court abuse its discretion when it dismissed a juror for not following instructions?
>
> III. Did the district court abuse its discretion or otherwise deprive Ms. Croy of a fair trial when it declined her request to restrict how the State split its time between initial closing summation and rebuttal argument?

## FACTS

[¶3]   Ms. Croy operated a small daycare out of her residence.  On September 25, 2019, an eight-month-old infant, MG, was one of the children in her care.  MG's mother dropped her off at the daycare at approximately 11:15 a.m.  Ms. Croy fed MG and put her down for a nap.  Before putting MG down, Ms. Croy placed her in a sleepsack with a swaddle attachment.  A swaddle attachment is a piece of fabric with Velcro pieces that "look like butterfly wings on the back when they are stretched open[,]" but when those "wings" are wrapped around the infant's torso, they "restrict the movement of the arms, [and] that sleepsack becomes a swaddle."  Ms. Croy placed MG in the sleepsack with the wings Velcroed across the infant's torso, restricting the movement of MG's arms.  Ms. Croy's employee left to go to lunch around 12:15 p.m., leaving Ms. Croy alone to supervise the 12 children who were in her care that day.  At 1:20 p.m., Ms. Croy checked on MG and discovered she was not breathing.  She instructed her adult daughter, who was in the house but not working as a daycare provider, to call 911.  The paramedics arrived shortly thereafter, attempted to resuscitate MG, and transported her to the hospital.  Hospital staff continued resuscitation efforts, but they were ultimately unsuccessful.

[¶4]   Because MG was a minor whose cause of death was unknown, the Laramie

1

County Coroner was required to conduct an investigation. *See* Wyo. Stat. Ann. § 7-4-104(a)(i)(H) (LexisNexis 2021) (defining a "coroner's case" as one where the cause of death is unknown); Wyo. Stat. Ann. § 7-4-201(b) (LexisNexis 2021) (requiring the coroner to conduct an investigation whenever she is notified the death is a "coroner's case"). The coroner conducted a parallel investigation with the Cheyenne Police Department.

[¶5] As a result of the investigation, law enforcement officers obtained the following information from the Department of Family Services' employee who was responsible for licensing Ms. Croy's daycare (daycare licenser). Following MG's death, at Ms. Croy's request, the daycare licenser went to the hospital to be with Ms. Croy. Ms. Croy told the daycare licenser she put MG down for a nap in the sleepsack with her arms wrapped, and she could see MG's "fingers poking out from the bottom." Ms. Croy demonstrated this position for the daycare licenser with her arms and wiggled her fingers. The daycare licenser believed this meant Ms. Croy had swaddled MG. Ms. Croy reported checking on MG at least twice after putting her down for a nap, and on both occasions, she saw MG had rolled or turned into a position Ms. Croy did not like. Ms. Croy repositioned MG, but she did not indicate whether she had changed the swaddle attachment to free MG's arms. The final time she checked on MG, Ms. Croy found MG had rolled so she could not see MG's face. When Ms. Croy turned MG over, she found the infant was not breathing.

[¶6] After completing her investigation, the coroner concluded MG died from positional asphyxia as a result of being improperly swaddled. The State charged Ms. Croy with involuntary manslaughter. Ms. Croy's case proceeded to a six-day jury trial. The jury convicted Ms. Croy of one count of felony involuntary manslaughter. Ms. Croy was sentenced to five-to-seven years in prison, suspended in lieu of five years of supervised probation. This appeal timely followed.

## DISCUSSION

### I. *Was there sufficient evidence to support the jury's verdict?*

[¶7] The standard of review we apply to sufficiency of the evidence claims is well established:

> This Court examines the evidence in the light most favorable to the State. We accept all evidence favorable to the State as true and give the State's evidence every favorable inference which can reasonably and fairly be drawn from it. We also disregard any evidence favorable to the appellant that conflicts with the State's evidence.

*Martens v. State*, 2023 WY 93, ¶ 16, 535 P.3d. 891, 897 (Wyo. 2023) (quoting *Thompson v. State*, 2018 WY 3, ¶ 14, 408 P.3d 756, 761 (Wyo. 2018)). "[W]e do not consider whether or not the evidence was sufficient to establish guilt beyond a reasonable doubt, but instead whether or not the evidence could reasonably support such a finding by the factfinder. We will not reweigh the evidence nor will we re-examine the credibility of witnesses." *Id.*, 535 P.3d at 896 (quoting *Thompson*, ¶ 14, 408 P.3d at 760). We defer to the jury and assume they believed the evidence adverse to Ms. Croy because they found her guilty. *Id.* (quoting *Thompson*, ¶ 14, 408 P.3d at 760).

[¶8]   Ms. Croy argues there was insufficient evidence to support the verdict in this case because the State's expert based her opinion regarding MG's cause of death on double hearsay. Ms. Croy asserts a finding of positional asphyxia was necessary for a conviction in this case, and without the expert's testimony, the jury was left to speculate about MG's cause of death. The State argues this evidence was received without a limiting instruction and could be used for any purpose. The State also asserts the jury received other significant evidence surrounding the cause of death, including from Ms. Croy's own expert, all of which supports a finding MG died from positional asphyxia.

[¶9]   The State's expert, Dr. Kelly Lear, based her opinion in part on statements Ms. Croy made to the daycare licenser following the incident, including that MG had been swaddled in a sleepsack and Ms. Croy found MG with her face obscured. Dr. Lear testified this information was "part of the key history" she needed to form her opinion that MG did not have the ability to breathe because her face was obstructed by something in the environment.

[¶10] Although Dr. Lear relied on hearsay, her opinion was admissible. We have recognized the Wyoming Rules of Evidence (W.R.E.) expressly allow an expert to use hearsay when forming an opinion, if other experts in that field would rely on similar evidence. *See Hayes v. State*, 935 P.2d 700, 703–04 (Wyo. 1997) (citing W.R.E. 703; *McGinn v. State*, 928 P.2d 1157, 1162–63 (Wyo. 1996); *LP v. Natrona Cnty. Dep't of Pub. Assistance and Soc. Servs.*, 679 P.2d 976, 1004 (Wyo. 1984)). In this case, Dr. Lear testified forensic pathologists often rely on statements from friends, family members, and others who witnessed the events when attempting to determine the cause of death. The record establishes contract pathologists, like the one who performed the autopsy in this case, must rely on information from the coroners, who in turn receive that information from a variety of sources. Thus, experts in the field of forensic pathology typically rely on the type of hearsay utilized by Dr. Lear when forming their opinions. Further, during the trial, Ms. Croy did not make a hearsay objection to Dr. Lear's testimony or to the admission of her report.[1] "'If evidence comes in without objection the jury may use it for

---

[1] We note Ms. Croy filed a pretrial motion to strike her report and preclude Dr. Lear from testifying at trial. However, the district court denied the motion, finding Dr. Lear's testimony satisfied the two-part

any legitimate purpose,' and we may rely on it in determining the sufficiency of the evidence to support a conviction." *Deephouse v. State*, 2023 WY 37, ¶ 16, 527 P.3d 1261, 1265 (Wyo. 2023) (quoting *Neidlinger v. State*, 2021 WY 39, ¶¶ 31–32, 482 P.3d 337, 346–47 (Wyo. 2021)). Dr. Lear's testimony was substantive evidence the jury could consider when reaching its verdict.

[¶11] The jury also heard other evidence pertaining to MG's cause of death. Two witnesses testified Ms. Croy swaddled MG before putting her down for a nap that day. The jury watched a video, recorded by a camera located in the daycare, that showed Ms. Croy carrying MG into the kitchen with the infant's arms still wrapped in the swaddle. Ms. Croy removed the sleepsack as she attempted to perform CPR. The jury learned DFS regulations prohibit swaddling an infant without a doctor's note, and even with a doctor's note, an infant cannot be swaddled once she is able to roll independently. Multiple witnesses testified swaddling an infant who can roll poses a danger of asphyxiation because the baby may suffocate if she rolls over with her arms restricted and cannot roll herself back over. The daycare licenser trained Ms. Croy in safe sleep practices, and Ms. Croy knew she should not be swaddling an infant who could roll. The sleepsack itself contained warnings that it should not be used on an infant who could roll independently. The State presented evidence MG was able to roll independently. Ms. Croy told the daycare licenser she had checked on MG at least twice and found her rolled or turned in a position she did not like and repositioned her. The daycare licenser testified Ms. Croy "used a motion, like a turning motion with both her hands to show that she moved [MG] back over . . ." on those occasions. The last time she checked on MG, Ms. Croy could not see MG's face, so she "turned her over" and that was when she discovered MG was not breathing. Even Ms. Croy's expert agreed it was "very conceivable" MG's death was caused by positional asphyxia.

[¶12] To convict Ms. Croy of involuntary manslaughter, the State had to prove beyond a reasonable doubt she involuntarily, but recklessly, killed MG without malice. Wyo. Stat. Ann. § 6-2-105(a)(ii) (LexisNexis 2021). "Recklessly" is defined as:

> A person acts recklessly when [s]he consciously disregards a substantial and unjustifiable risk that the harm [s]he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation[.]

Wyo. Stat. Ann. § 6-1-104(a)(ix) (LexisNexis 2021). The State presented sufficient

---

test for expert testimony established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S 579, 113 S. Ct. 2786, 125 L. Ed. 469 (1993). Ms. Croy did not appeal that ruling.

evidence for the jury to conclude swaddling MG posed a substantial and unjustifiable risk of death, Ms. Croy understood that risk and consciously disregarded it, resulting in MG's death. There was sufficient evidence to sustain the jury's verdict.

### II. Did the district court abuse its discretion when it dismissed a juror for not following instructions?

[¶13] Almost immediately after the jury retired to consider its verdict, a juror identified as Juror No. 1 informed the bailiff that Juror DN had approached him in the parking garage the previous Friday evening and said something like: "I don't think the State has made its case." The district court reported this incident to the parties and stated:

> Obviously that's not in compliance with the rules that I've told them throughout the proceedings and not supposed to make up your minds until the case is finally given to you. So what I'd like to do at this point is bring [DN] in. He's been separated in a different room. And ask him if that's accurate and see what he says. And I think probably regardless of what he says, I will still excuse him.

The district court indicated it would be improper to allow DN to continue serving after Juror No. 1 came forward to report the incident.

[¶14] The district court brought DN into the courtroom, and he confirmed he had spoken to the other juror: "I said I'm still open about it, but I don't know where I'm standing kind of a thing, yeah." He also confirmed he said something "similar" to he did not think the State had made its case. The district court then admonished DN, saying "that is not really in keeping with our rules that you're not to make up your mind until the case is finally submitted to you, I'm going to excuse you at this point." Ms. Croy objected to the dismissal of DN because he indicated he could still keep an open mind. The district court excused DN over Ms. Croy's objection, finding there was sufficient evidence to excuse him because he had made up his mind to some extent, even though the court "repeatedly told the jurors throughout these proceedings to keep an open mind." In addition, the district court was concerned by the fact that Juror No. 1 felt the incident was important enough to leave the jury room and report it to the bailiff. DN was replaced by the first alternate.

[¶15] Ms. Croy alleges the district court abused its discretion when it discharged juror DN despite being informed the juror could keep an open mind. Ms. Croy asks us to apply the same standard to this case that we do to dismissing prospective jurors during voir dire. She claims that whenever a juror has formed or stated an opinion, the ultimate question should be whether that juror can set aside that opinion. The State contends the court properly dismissed the juror for violating the court's rules.

5

[¶16]  We review a district court's decision on whether to dismiss a juror for an abuse of discretion. *See Castellanos v. State*, 2016 WY 11, ¶ 102, 366 P.3d 1279, 1306 (Wyo. 2016) (quoting *Carothers v. State*, 2008 WY 58, ¶ 4, 185 P.3d 1, 4 (Wyo. 2008)) (discussing the standard of review for dismissing a juror during voir dire); *Benjamin v. State*, 2011 WY 147, ¶¶ 25–35, 264 P.3d 1, 9–10 (Wyo. 2011) (discussing the standard of review to apply to a district court's denial of a motion to remove of a juror made during trial).  Generally, a court abuses its discretion if it discharges a juror "without factual support, or for a legally irrelevant reason." *United States v. Abbell*, 271 F.3d 1286, 1302 (11th Cir. 2001) (quoting *United States v. Register*, 182 F.3d 820, 840 (11th Cir. 1999)).

[¶17]  Rule 23(b) of the Wyoming Rules of Criminal Procedure (LexisNexis 2021) (W.R.Cr.P.) allows a court to excuse a juror "for any just cause after trial commences." Our rule is similar to Rule 23 of the Federal Rules of Criminal Procedure.  "[W]e can look to federal precedent interpreting similar rules as persuasive authority." *Adams v. State*, 2023 WY 85, ¶ 21, 534 P.3d 469, 476 (Wyo. 2023) (citing *Pena v. State*, 2013 WY 4, ¶ 48, 294 P.3d 13, 22–23 (Wyo. 2013)).  While we have not expressly addressed this issue, federal courts recognize "just cause" exists to dismiss a juror who "refuses to apply the law or to follow the court's instructions." *Abbell*, 271 F.3d at 1302 (citing *United States v. Geffrard*, 87 F.3d 448, 451–52 (11th Cir. 1996)); *see also United States v. Edwards*, 303 F.3d 606, 631–34 (5th Cir. 2002) (affirming dismissal of a juror for refusing to follow instructions and for lack of candor).

[¶18]  In this case, DN admittedly violated the district court's instructions by discussing the case with another juror prior to deliberations.  "It is not proper for jurors to discuss a case between themselves when they are not functioning as a jury." 89 C.J.S. *Trial* § 948 (Aug. 2023 Update).  In addition, "[p]rejudging a case is serious misconduct by a juror . . . ." 89 C.J.S. *Trial* § 942 (Aug. 2023 Update).  DN's comments violated the district court's instruction not to prejudge the case, even though he later claimed he was "still open about it."  DN failed to comply with the district court's instructions, giving the district court just cause to remove him.  The district court had factual support and a legally relevant reason to dismiss DN.  It did not abuse its discretion when it removed him and replaced him with an alternate.[2]

---

[2] We also note Ms. Croy made no attempt to show she was prejudiced by DN's removal.  We have held only prejudicial errors require reversal. *See, e.g., Berry v. State*, 2023 WY 75, ¶ 31, 533 P.3d 474, 483–84 (Wyo. 2023) (quoting *Thompson v. State*, 2021 WY 84, ¶ 28, 491 P.3d 1033, 1042 (Wyo. 2021)) ("Prejudicial error requires reversal, while harmless error does not."); *West v. State*, 2013 WY 128, ¶ 21, 311 P.3d 157, 163 (Wyo. 2013) (citing *State v. Spears*, 300 P.2d 551, 557 (Wyo. 1956); *Daniel v. State*, 2003 WY 132, ¶ 15, 78 P.3d 205, 212 (Wyo. 2003)) ("[I]n order to warrant reversal of a conviction, error must be prejudicial.  Even when a constitutional error is involved, reversal is not required if we conclude it was harmless beyond a reasonable doubt.").

***III. Did the district court abuse its discretion or otherwise deprive Ms. Croy of a fair trial when it declined her request to restrict how the State split its time between initial closing summation and rebuttal argument?***

[¶19]  At the end of the jury instruction conference, Ms. Croy asked the district court if it was going to impose a time limit on closing arguments.  The district court stated 45 minutes was usually sufficient, but it would not stop counsel if they needed more time.  Ms. Croy then asked the district court that any time limit be "split accordingly with the State's main argument and rebuttal.  Just to prevent the State taking more time in rebuttal than the main argument."  The State argued it would be inappropriate to place such a limit on the State's rebuttal argument because rebuttal "is to address the points made by the defendant[,]" and the amount of time needed for rebuttal depended on what the defense said.  After referring to its case management order, the district court indicated the State had been allotted 45 minutes for closing argument, and the State could split that time between its main closing and rebuttal argument in whatever way it chose.

[¶20]  The State's initial closing summation was limited and short.  It spans just three pages of the transcript.  The State thanked the jurors for their time, asked them to apply the jury instructions they had been given, and asked them to weigh the credibility of the witnesses when reaching their verdict.  The defense gave a detailed closing argument challenging certain aspects of the case.  The State's rebuttal argument was much longer than its initial closing summation.  It spans 15 pages of the transcript.  In its rebuttal argument, the State responded to the arguments made in the defense's closing argument.  The defense did not ask for surrebuttal.

[¶21]  Ms. Croy asserts the district court abused its discretion when it allowed the State to "make an opening argument as its rebuttal."  She asserts this was a violation of W.R.Cr.P. Rule 29.1 because by waiving initial closing summation, the prosecutor also waived rebuttal argument.[3]  She claims she had no way of responding to the State's lengthy rebuttal argument, which resulted in denial of a fair trial.  The State contends Ms. Croy has not cited any legal authority demonstrating the trial court abused its discretion through its time management order.  The State further asserts Ms. Croy cannot demonstrate there was any improper content in its rebuttal argument, that the way it structured its argument violated a clear and unequivocal rule, or she was harmed by any alleged error.

[¶22]  "A trial court's decision to place time restrictions on closing arguments is reviewed under an abuse of discretion standard." *Sanchez v. State*, 2006 WY 116, ¶ 31,

---

[3] W.R.Cr.P. 29.1. states: "After the evidence has been presented and the judge has instructed the jury on the law closing argument shall be permitted.  The prosecution shall open the argument.  The defense shall be permitted to reply.  The prosecution shall then be permitted to reply in rebuttal."

142 P.3d 1134, 1143 (Wyo. 2006) (citing *Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 2555, 45 L. Ed. 2d 593 (1975); *Cole v. Tansy*, 926 F.2d 955, 958 (10th Cir. 1991)). "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily and capriciously." *Id.* (quoting *Penner v. State,* 2003 WY 143, ¶ 7, 78 P.3d 1045, 1047 (Wyo. 2003)).

[¶23] Contrary to Ms. Croy's argument, although the State gave a limited and short initial closing summation, the State did not entirely waive its initial opening summation. Therefore, no W.R.Cr.P. 29.1 violation occurred when the State gave a short opening summation and lengthy rebuttal argument. However, we must determine whether Ms. Croy was deprived of a fair trial when the district court declined her request to place restrictions on the manner in which the State could divide its allotted time.

[¶24] Trial courts are afforded discretion in controlling their courtrooms, including closing arguments in criminal cases:

> The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion.

*Sanchez*, ¶ 33, 142 P.3d at 1143 (quoting *Herring*, 422 U.S. at 862, 95 S. Ct. at 2554) (emphasis removed). The technique of reserving the bulk of the State's closing argument for rebuttal has been characterized by other jurisdictions as "sandbagging." *See, e.g.*, *Bailey v. State*, 440 A.2d 997, 1001 (Del. 1982). The issue of sandbagging is one of first impression for this Court.[4]

---

[4]At least one state has found sandbagging may constitute prosecutorial misconduct. *People v. Robinson*, 31 Cal. App. 4th 494, 505 (Cal. Ct. App. 1995) (finding prosecutor committed misconduct by giving a perfunctory opening argument "designed to preclude effective defense reply" and then giving a rebuttal argument that was ten times longer and "immune from defense reply"); *Odom v. Miller*, No. LA CV 12–04141–VBF–SS, 2014 WL 4384651, at *5 (D. C.D. Cal. Sept. 3. 2014) ("a prosecutor commits misconduct if he 'sandbags' the defense by giving a perfunctory initial closing argument followed by a lengthy rebuttal"). Ms. Croy did not frame her claim as one of prosecutorial misconduct, so we will not address this issue as such. *Woods v. State*, 2017 WY 111, ¶ 18, 401 P.3d 962, 969 (Wyo. 2017) (quoting *Snyder v. State*, 2015 WY 91, ¶ 15 n.1, 353 P.3d 693, 695 n.1 (Wyo.2015)) ("This 'Court will not frame the issues for the litigants and will not consider issues not raised by them and not supported by cogent argument and authoritative citation.'").

[¶25] We have frequently discussed the significance of providing a defendant with a constitutionally fair trial and protecting a defendant's fundamental right to present a defense. *See, e.g., Munoz v. State*, 2013 WY 94, ¶¶ 16–18, 307 P.3d 829, 834 (Wyo. 2013) (collecting cases). "Closing argument is 'an aspect of a fair trial which is implicit in the Due Process Clause of the Fourteenth Amendment by which the States are bound.'" *Bailey,* 440 A.2d at 1003 (citing *Hooks v. State*, 416 A.2d 189, 204–05 (Del. Supr. 1980)). "The purpose of closing argument is to allow counsel to offer ways of viewing the significance of the evidence." *Dysthe v. State*, 2003 WY 20, ¶ 24, 63 P.3d 875, 884 (Wyo. 2003) (citing *Hopkinson v. State*, 632 P.2d 79, 145 (Wyo. 1981)). However, we place limits on prosecutors' closing arguments designed to ensure the fairness of the trial and prevent compromise of the judicial system. *Id.*, 63 P.3d at 884–85.

[¶26] In *Bailey*, the Delaware Supreme Court recognized a trial court has discretion to govern the scope of the State's rebuttal argument, but that discretion is not so broad as to permit a trial judge "to oversee a blow to a defendant's right to a fair trial via the State's sandbagging." *Id.* at 1003. In *Bailey*, the Delaware Supreme Court recognized that while each case must be decided on "its own peculiar facts," there are certain factors that should be considered when determining whether a case should be reversed due to a prosecutor's use of sandbagging in rebuttal argument:

> whether a fair statement of the State's position has been made in some manner in its opening argument; whether any waiver has been made by the defendant, either by his counsel's own argument or by the failure to object properly and to preserve the point; and, lastly, a determination of the question of prejudice in view of all the circumstances.

440 A.2d at 1002 (quoting *State v. Peterson*, 423 S.W.2d 825, 831 (Mo. 1968)). Courts are more likely to reverse due to sandbagging if a prosecutor "exceed[s] the scope of its rebuttal by delving into matter purposely left untouched by defense counsel in his summation." *Id.* at 1003; *see also People v. Rios*, B293392, 2020 WL 241936, at *4 (Cal. Ct. App. Jan. 16, 2020) (finding no reversible error when prosecutor's rebuttal argument was "a fair response to the theory raised by defense counsel during his closing argument").

[¶27] We agree with the approach taken in *Bailey* and find every case must be evaluated on its particular facts. We have repeatedly recognized that "[b]efore we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused." *Black v. State*, 2017 WY 135, ¶ 13, 405 P.3d 1045, 1050 (Wyo. 2017) (quoting *McGinn v. State*, 2015 WY 140, ¶ 13, 361 P.3d 295, 299 (Wyo. 2015)). The factors set forth in *Bailey* are

helpful to our resolution of this issue. In this case, there was no "fair statement" of the State's position in its initial closing argument. The State made no comment on any of the evidence. In fact, the State did not even ask the jury to return a guilty verdict. This factor could weigh in favor of finding the district court abused its discretion by allowing the State to present a lengthy rebuttal argument.

[¶28] Turning to the second factor, although Ms. Croy raised the issue of how the State could divide its closing argument at the jury instruction conference, she did not object to the sufficiency of the State's summation at the conclusion of the State's initial closing argument. Nor did she make any objections that the State's rebuttal argument addressed matters outside of those she raised in her own closing argument. Ms. Croy only objected once during the State's rebuttal argument, claiming the State was mischaracterizing the evidence about how Ms. Croy repositioned MG. The district court instructed the jury to rely on its memory of the evidence and not the attorneys' arguments. Finally, Ms. Croy did not ask for surrebuttal. This factor weighs in favor of finding the district court did not abuse its discretion when it allowed the State to make its rebuttal argument.

[¶29] Lastly, with respect to prejudice, Ms. Croy has not pointed to any inappropriate content in the State's rebuttal argument. She has not demonstrated any way in which the State's argument exceeded the scope of the defense's closing "by delving into matter purposely left untouched by defense counsel in his summation." *Bailey*, 440 A.2d at 1003. Similarly, Ms. Croy "has not pointed to a specific argument that [s]he passed-up in reliance on the State's closing summation[,]" nor has she "demonstrated how [she] was prejudiced by [her] failure to make a particular argument." *State v. Miller*, No. 9605003827, 1999 WL 167837, at *5 (Del. Super. Ct. Feb. 12, 1999). She has not shown there is a reasonable probability the verdict might have been more favorable to her if the prosecutor had not been allowed to make a lengthy rebuttal argument. *See Black*, 2017 WY 135, ¶ 13, 405 P.3d at 1050 (quoting *McGinn*, 2015 WY 140, ¶ 13, 361 P.3d at 299).

[¶30] Based on the particular facts of this case, we cannot find the district court abused its discretion or deprived Ms. Croy of a fair trial when it declined her request to impose restrictions on how the State split its time between closing summation and rebuttal argument.

## CONCLUSION

[¶31] The evidence was sufficient to support the jury's verdict. The district court did not abuse its discretion when it dismissed a juror for failure to follow its instructions. Based on the facts of this case, the district court did not abuse its discretion or deny Ms. Croy a fair trial when it declined her request to impose restrictions on how the State split its time between closing summation and rebuttal argument. Affirmed.